1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE

9

10    COLIN BANCROFT,                          CASE NO. C17-1312JLR

11                          Plaintiff,          ORDER ON CROSS MOTIONS
                v.                              FOR SUMMARY JUDGMENT
12

13    MINNESOTA LIFE INSURANCE
      COMPANY,
14
                            Defendant.
15

16
                        I.    INTRODUCTION
17
          Before the court are (1) Plaintiff Colin Bancroft's motion for summary judgment
18
      of liability on all claims against Defendant Minnesota Life Insurance Company
19
      ("Minnesota Life") (Plf. 2d MSJ (Dkt. # 29) at 2 ("The undisputed facts in this matter
20
      lead to the conclusion that Minnesota Life is liable on all claims made by [Mr.]
21
      Bancroft."); and (2) Minnesota Life's cross motion for summary judgment of no liability
22
      on all of Mr. Bancroft's claims (Def. MSJ (Dkt. # 35)).  The court has considered the

motions, the submissions filed in support of and in opposition to both motions, the relevant portions of the record, and the applicable law.  In addition, on June 12, 2018, the court heard counsel's oral argument.  Being fully advised, the court DENEIS Mr. Bancroft's motion for summary judgment and GRANTS Minnesota Life's cross motion as more fully described herein.

## II.    BACKGROUND

### A.    The Accelerated Benefits Policy Rider

Mr. Bancroft is an employee of King County.  (10/25/17 Bancroft Decl. (Dkt. # 8) ¶ 2.)  Minnesota Life issued a Group Term Life Insurance Policy ("the Policy") to King County.  (Compl. (Dkt. # 1-1) ¶ 4; Ans. (Dkt. # 4) ¶ 4.)  As a part of his benefits package, Mr. Bancroft is covered under the Policy.  (Compl. ¶ 6; Ans. ¶ 6.)  The Policy's Basic Life Insurance provision pays one year's salary upon acceptance of a claim.  (*Id.*)  Mr. Bancroft also paid for Supplemental Life Insurance, which provides for an additional four years of salary as a death benefit.  (*Id.*)

Included in the Policy is an Accelerated Benefits Policy Rider ("the ABPR"), which provides "for the accelerated payment of . . . the full . . . amount of an insured's death benefit . . . [i]f the insured has a terminal condition as defined in the [ABPR]." (11/06/17 Marisseau Decl. (Dkt. # 16) ¶ 4, Ex. A at ML 0037.)  The ABPR defines a "terminal condition" as "a condition caused by sickness or accident which directly results in a life expectancy of twenty-four months or less."  (*Id.*)  The insured must request the accelerated payment and give Minnesota Life "evidence that satisfies [Minnesota Life] that the insured's life expectancy, because of sickness or accident, is twenty-four months

or less." (*Id.*)  The evidence that the insured provides "must include certification by a physician."  (*Id.*)  The ABPR also states:

> [Minnesota Life] reserve[s] the right to ask for independent medical verification of a terminal condition.  In the case of a difference of opinion, the insured has the right to mediation or binding arbitration conducted by a disinterested third party who has no ongoing relationship with either party.

(*Id.*)  Finally, Minnesota Life "retain[s] the right to have the insured medically examined at [its] own expense to verify the insured's medical condition."[1]  (*Id.*)

**B.     Mr. Bancroft's Diagnosis with Stage IV Mantle Cell Lymphoma**

Dr. Sherry Hu examined Mr. Bancroft on January 25, 2017.  (Hu Decl. (Dkt. # 10) ¶ 5.)  On January 25, 2017, Dr. Hu performed a bone marrow biopsy on Mr. Bancroft and ordered a PET/CT scan.  (*Id.*)  On January 30, 2017, Mr. Bancroft underwent a PET/CT scan.  (*Id.*)  On February 1, 2017, Mr. Bancroft returned to the clinic, and Dr. Hu informed him that he had high risk stage IV mantle cell lymphoma and recommended immediate treatment.  (*Id.* ¶ 6; *see also* Plf. 1st MSJ (Dkt. # 7) at 4 ("On February 1, 2017, [Mr.] Bancroft returned . . . for the results of the biopsy and PET/CT. . . . At that time, Dr. Hu diagnosed him with Stage IV Mantle Cell Lymphoma and recommended immediate treatment."); *see also* 10/25/17 Bancroft Decl. ¶ 6; Compl. ¶ 16.)

On February 6, 2017, Mr. Bancroft came under the care of Dr. Andrew Cowan. (10/25/17 Bancroft Decl. ¶¶ 6-7.)  Dr. Cowan confirmed Dr. Hu's diagnosis.  (10/25/17 Cowan Decl. (Dkt. # 9) ¶ 5.)  Mr. Bancroft chose to see Dr. Cowan because he is an

//

---

[1] Mr. Bancroft also provides a copy of the insurance policy and ABPR in his declaration. (10/25/17 Bancroft Decl. ¶ 16, Ex. A.)

oncologist with expertise in mantle cell lymphoma. (10/25/17 Bancroft Decl. ¶ 6.) Dr. Cowan prescribed a treatment regime, and Mr. Bancroft started chemotherapy on February 17, 2017. (*Id.* ¶ 7.)

**C.     Mr. Bancroft's Claim to Minnesota Life**

After his diagnosis, Mr. Bancroft completed a Notice of Claim for Accelerated Benefit, a form provided by Minnesota Life. (*Id.* ¶ 11, Ex. C.) Mr. Bancroft submitted this form to Minnesota Life on or about May 16, 2017. (*Id.*) He requested payment of "100%" of the accelerated benefit at that time. (*Id.*) On May 26, 2017, Dr. Cowan signed an Attending Physician's Statement that was provided to Minnesota Life in support of Mr. Bancroft's claim. (*See id.*)

In the Attending Physician's Statement, Dr. Cowan states that Mr. Bancroft was "diagnosed w/stage IV mantel cell lymphoma high risk leukemia presentation w/elevated LDH." (*Id.* at 5.) He states that Mr. Bancroft was undergoing VR-CAP treatment,[2] indicated that Mr. Bancroft's progress was "[i]mproved," and noted that he expected "[i]mprovement" as a "fundamental or marked change" in Mr. Bancroft's condition.[3] (*Id.* at 5-6.)

Dr. Cowan indicated on the form that Mr. Bancroft's condition was terminal. (*Id.* at 6.) He states that Mr. Bancroft's Mantel Cell Lymphoma International prognostic

---

[2] VR-CAP is a combined form of chemotherapy comprised of rituximab, cyclophosphamide, doxorubicin, vincristine, and prednisone. (11/13/17 Shapland Decl. (Dkt # 22) ¶ 13.)

[3] On the form, the words—"marked change"—are underlined. (10/25/17 Bancroft Decl. ¶ 11, Ex. C at 6.)

index ("MIPI") score is 7.2,[4] but Dr. Cowan does not base his prognosis for Mr. Bancroft on this score. (*See* Cowan Dep. at 56:24-75:5.) Instead, based on a 2007 "publication in *Cancer* (PMID 17477385)," Dr. Cowan opined that "the median survival for [Mr. Bancroft] would be 24 months." (10/25/17 Bancroft Decl. ¶ 11, Ex. C at 6 (italics added).) The paper on which Dr. Cowan relied was published before the MIPI score was developed in 2008. (11/13/17 Shapland Decl. ¶ 18; *see* Cowan Dep. at 56:24-57:4 ("Q: . . . So Exhibit 13 is the stuff that you're referencing as, well, the only medical literature that you're citing in support of your prognosis? A: Yeah, uh-huh. Q: And that's a 2007 study? A: That's correct."); *see id.*, Ex. 13.) Dr. Cowan later testified that his "prognosis [also] included [his] overall evaluation of Mr. Bancroft at that time." (10/25/17 Cowan Decl. ¶ 9.) Dr. Cowan provided his contact information on the form, as well as contact information for Dr. Hu.[5] (10/25/17 Bancroft Decl. ¶ 11, Ex. C at 6.)

//

---

[4] The MIPI score was first published as a prognostic index in 2008 and was validated in a subsequent 2014 study. (*See* 11/6/17 Marisseau Decl. (Dkt # 16) ¶ 19, Ex. I; *see also* 11/13/17 Shapland Decl. ¶ 8; 5/11/18 Crowe Decl. (Dkt. # 40) ¶ 2 (attaching excerpts of Dr. Cowan's deposition at Dkt. # 40-1) ("Cowan Dep.") at 13:3-12, 15:1-16:1.) Excerpts of Dr. Cowan's deposition can also be found in the May 7, 2018, declaration of Medora A Marisseau. (5/7/18 Marisseau Decl. (Dkt. # 36) ¶ 7, Ex. 3.) Irrespective of where excerpts of Dr. Cowan's deposition appear in the record, the court will simply reference the "Cowan Dep."

[5] The Attending Physician's Statement included the following request: "*** **Please Attach Medical Records ***.**" (*Id.*; *see also id.* at 1 ("**PLEASE NOTE, WE ARE REQUESTING THAT COPIES OF YOUR MEDICAL RECORDS BE SUBMITTED WITH THIS FORM BY YOUR PHYSICIAN TO ASSIST IN EXPEDITING OUR REVIEW.**").) Dr. Cowan did not attach any medical records. (*See id.*) However, Mr. Bancroft executed an authorization for "any provider of health care, physician, medical practitioner, [or] hospital . . . which has any medical . . . records or knowledge . . . to give all such information it has to **Minnesota Life** . . . or its authorized representative." (4/19/18 Crowe Decl. (Dkt. # 30) ¶ 3, Ex. 25 at 5.)

During his deposition, Dr. Cowan conceded that the 2007 *Cancer* publication is the only medical literature he relied upon to support his 24-month life expectancy estimate. (Cowan Dep. at 56:24-57:5.) He also acknowledged that the 2007 study "could be" outdated and that at least one of the treatments that Mr. Bancroft received was not available during the applicable time period of the 2007 study. (*Id.* at 58:3-25; 59:8-14.) Dr. Cowan testified that the reason, in part, that he relied on the 2007 study rather than Mr. Bancroft's MIPI score was due to Mr. Bancroft's high white blood cell count and LDH. (*Id.* at 55:13-56:4.) Yet, Dr. Cowan admitted that these factors are accounted for as part of the MIPI score. (*Id.* at 56:10-12.) Dr. Cowan also stated that chromosomal changes, such as the deletion of 17p (long arm chromosome 17), was a factor that put Mr. Bancroft at high risk. (*Id.* at 55:13-56:4; 10/25/17 Cowan Decl. ¶ 6.) Yet, Dr. Cowan also admitted in his deposition that a 2011 publication in the Journal of Leukemia "certainly . . . call[s] into question whether 17p deletions are important." (Cowan Dep. at 65:11-67:4; *see also* Grinblatt Decl. ¶ 7.) Dr. Cowan acknowledged that his 24 month estimate for Mr. Bancroft life expectancy was a deviation from the MIPI score prognosis, but he stated that life expectancy estimation is "not a perfect science," and he tries "to be more realistic and maybe a bit paranoid and pessimistic rather than overly optimistic." (Cowan Dep. at 61:3-18.)

Mr. Bancroft does not recall Dr. Cowan advising him that his life expectancy was 24 months or less. (5/7/18 Marisseau Decl. ¶ 5, Ex. 1 ("Bancroft Dep.") at 87:8-88:16.) Rather, Mr. Bancroft repeatedly described Dr. Cowan as "very encouraging" or "very positive." (*Id.* at 44:3-5; 46:1-5.) Indeed, in contrast to the 24-month median survival

prognosis that Dr. Cowan provided to Minnesota Life, Dr. Cowan advised Mr. Bancroft in February 2017 that "the median overall survival [for] mantle cell lymphoma is about 5-7 years . . . but with new intensive treatments . . . many patients are living much longer." (Cowan Dep. at 18:19-19:5.) Mr. Bancroft testified that he "[a]bsolutely" expected Dr. Cowan to provide him with accurate information concerning overall median survival so that he could make informed decisions about treatment options (Bancroft Dep. at 45:16-21), and Dr. Cowan testified that his statement to Mr. Bancroft was accurate at the time he gave it. (Cowan Dep. at 19:11-14.)

**D.    Minnesota Life's Initial Review of Mr. Bancroft's Claim**

Upon receipt of Mr. Bancroft's claim, Minnesota Life forwarded the claim to its medical reviewer, Dr. Maryam Shapland, for an evaluation of Mr. Bancroft's prognosis. (*See* 11/13/17 Shapland Decl. ¶ 7.) Dr. Shapland limited her review to the notes of Minnesota Life's claims examiner, Ms. Sarah Taylor, and Dr. Cowan's Attending Physician's Statement. (4/19/18 Crowe Decl. ¶ 3 (attaching excerpts of the March 28, 2018, deposition of Dr. Shapland) ("Shapland Dep.") at 31:13-20.) She also reviewed "Up to Date," a resource that provides information and current scientific articles on various medical conditions, including mantle cell lymphoma. (*Id.* at 52:9-55:6; 5/7/18 Shapland Decl. (Dkt. # 38) ¶ 2.) The Up to Date article that Dr. Shapland reviewed further referred to an article in a publication known as *Blood.* (Shapland Dep. at 52:9-55:6.) The *Blood* article consists of the first published information on the MIPI score. (*Id.*; Cowan Dep. at 13:9-12.) Dr. Shapland did not read the *Blood* article, but relied

//

1  instead on the information Up to Date conveyed about that article.  (Shapland Dep. at

2  52:9-55:6.)

3     The MIPI score is a "well-recognized evidence based prognostic index for patients

4  with mantle cell lymphoma."  (11/13/17 Shapland Decl. ¶ 8.)  A physician can determine

5  an MIPI score for any individual diagnosed with mantle cell lymphoma based on four

6  independent factors:  age, ECOG performance status, lactate dehydrogenase ("LDH")

7  (which is a cell enzyme), and leukocyte count (which is also known as white blood cell

8  count).  (*Id.* ¶ 9; Grinblatt Decl. (Dkt. # 37) ¶ 5; *see also* Cowan Dep. at 13:13-18.)  A

9  biologic MIPI score includes those same four factors but also includes analysis of Ki-67

10 positive cells, a marker for proliferation or how fast a tumor is growing that has

11 independent prognostic value when considered with the MIPI score.  (11/13/17 Shapland

12 Decl. ¶ 9; Grinblatt Decl. ¶ 6; Cowan Dep. at 16:2-19.)  The MIPI, including the biologic

13 MIPI, takes into account all the characteristics of the disease at issue that have been

14 confirmed to have a statistically significant effect on prognosis.  (Grinblatt Decl. ¶ 6;

15 Cowan Dep. at 16:2-19.)

16    An MIPI score from 6-12 is considered a high-risk MIPI score.  (11/13/17

17 Shapland Decl. ¶ 10.)  Mr. Bancroft's attending physician, Dr. Cowan, scored Mr.

18 Bancroft at 7.2.  (*Id.*; 10/25/17 Bancroft Decl. ¶ 11, Ex. C at 5.)  The 2008 *Blood* article

19 indicated that patients with a high-risk MIPI score had a median overall survival of 29

20 months and patients with a high-risk biologic MIPI score had a median overall survival of

21 //

22 //

37 months.[6]  (11/13/17 Shapland Decl. ¶ 11.)  Thus, based on his score, the high-risk

biologic MIPI predicted a median overall survival of 37 months for individuals such as

Mr. Bancroft.  (*See id.*; Grinblatt Decl. ¶ 6; *see also* 10/25/17 Cowan Decl. ¶ 13 ("The

letter provided by Minnesota Life also refers to a life expectancy of 37 months being the

'median survival' expected of Mr. Bancroft.  I presume that this was taken from . . .

*Blood* 2008 – using the biologic MIPI, which is not as widely used as the MIPI score.")

(italics added).)  Dr. Shapland also considered Dr. Cowan's statement on the Attending

Physician's Statement that Mr. Bancroft was responding to treatment, his notation that

Mr. Bancroft's condition was "[i]mproved," and his expectation that Mr. Bancroft will

continue to experience "fundamental or marked" "[i]mprovement."  (*See* 10/25/17

Bancroft Decl. ¶ 11, Ex. C at 6.)  Dr. Shapland did not ask for any additional medical

records or information from Dr. Cowan, although she recognized that she had the ability

to do so.  (Shapland Dep. at 66:10-67:4.)

Based on her review of Dr. Cowan's Attending Physician's Statement and the

medical information in Up to Date, Dr. Shapland opined that she was "unable to

determine with greater than 90% certainty that [Mr. Bancroft's] life expectancy is 24

months or less."  (4/19/18 Crowe Decl. ¶ 3, Ex. 22 (attaching claim journal entries from

Minnesota Life for Mr. Bancroft's claim).)  As Minnesota Life explained:

//

---

[6] The use of the MIPI score to determine overall survival was confirmed in a later 2014
study.  (11/13/17 Shapland Decl. ¶ 12.)  In the 2014 study, a younger group with high-risk MIPI
scores had a median overall survival of 46 months.  (*Id.*)  The elderly group with a high-risk
MIPI score had a median overall survival of 31 months.  (*Id.*)  The median overall survival for
the entire group was 34 months.  (*Id.*)

> The 90% confidence in a life expectancy of 24 months or less is a standard applied at Minnesota Life. It is based on the policy provision that provides that Minnesota Life "must be given evidence that satisfies us that the insured's life expectancy, because of accident or sickness, is twenty four months or less."

*************

> As noted, Dr. Shapland was orally advised of Minnesota Life's policy that she should apply a 90% level of confidence in determining the level of satisfactory evidence to determine life expectancy, rather than 100%.

(4/19/18 Crowe Decl. ¶ 3, Ex. 32 at 7, 9.) Nevertheless, Dr. Shapland testified that whether she applied a "more likely than not" or a "90% certainty" standard to the evidence relating to Mr. Bancroft's life expectancy, her opinion would be the same. (5/7/18 Shapland Decl. ¶ 10.) She also testified that she believes both her opinion and Dr. Cowan's prognosis are reasonable. (Shapland Dep. at 71:14-17 ("I feel that my opinion was reasonable, and [Dr. Cowan's] opinion was reasonable. . . . There's no exact way to determine exact life expectancy.").)

Dr. Cowan testified that he put Mr. Bancroft's MIPI score into his medical notes because "it conveys information about risk and prognosis." (Cowan Dep. at 13:2.) He agreed that the MIPI prognostic index was first validated in the 2008 *Blood* article and then confirmed again in a later 2014 study. (*Id.* at 13:3-12; 15:1-16:1, Ex. 3.) Although Dr. Cowan believed that his 24-month prognosis for Mr. Bancroft in the Attending Physician's Statement was reasonable, he agreed that either the 29-month non-biologic

//

//

//

//

MIPI or the 37-month biologic MIPI was a reasonable estimate of Mr. Bancroft's life expectancy at the time.[7]

      Minnesota Life retained an expert witness, Dr. David Grinblatt, M.D., who specializes in blood cancers.[8]  Dr. Grinblatt agrees with Dr. Shapland that the median overall survival rate for Mr. Bancroft was 37 months at the time of his claim based on the standard biologic MIPI.  (Grinblatt Decl. ¶ 6.)  Further, he opines:

> The biologic MIPI, when available, is the standard prognostic metric for mantle cell lymphoma.  The MIPI, including the biologic MIPI, takes into account all of the characteristics of this disease which have been validated to have a statistically significant effect on prognosis.  It is the fairest, most objective measure for determining prognosis for mantle cell lymphoma.  The MIPI, including biologic MIPI, remains the best and only validated method to assess survival in patients with Mantle Cell Lymphoma.

//

---

[7] Q:  Well, would you agree that a reasonable conclusion would also be that prognosis of 29 months, consistent with the MIPI score, would be accurate for Mr. Bancroft?
A:  It could be –
Q:  Okay.
A:  -- for a patient.
Q:  Well, for Mr. Bancroft.
A:  For Mr. Bancroft, it could be.
              *******
Q:  Okay.  So one reasonable interpretation was your –
A:  Yes.
Q:  -- 24 months?
A:  Yes.
Q:  And another reasonable interpretation was the MIPI prognosis, 29 –
A:  Sure.
Q:  -- or 37?
A:  You could say that.

(Cowan Dep. at 61:19-62:2; 62:24-63:8.)

[8] Mr. Bancroft did not challenge the admissibility of Dr. Grinblatt's opinion testimony.  (*See generally* Plf. Reply (Dkt. # 39); Plf. Resp. (Dkt. # 46).)

(*Id.*)  He also notes that "it was reasonable to determine that Mr. Bancroft had a median life expectancy of greater than 24 months as of May 2017, based on his February diagnosis."  (*Id.* ¶ 10.)

**E.      Minnesota Life's Initial Response to Mr. Bancroft's Claim.**

After receiving Dr. Shapland's opinion, Minnesota Life's claims examiner, Ms. Taylor, sent a letter dated June 8, 2017, to Mr. Bancroft containing the following statement:

> With the information we received from your doctor, we are unable to determine, at this time, if your life expectancy will be less than 24 months, which the policy requires.  Your doctor did indicate on the claim form that your condition was terminal and provided a life expectancy of 24 months.  Per medical literature, median survival for your diagnosis is 37 months.  You were diagnosed in January 2017.  You are currently undergoing treatment and your physician states that your condition has improved and marked change (improvement) is continued to be expected.  We understand this a difficult and sensitive issue.  Please be assured this is not a permanent denial of benefits.  At this time, however, the medical information does not support a life expectancy of 24 months or less, which the policy requires.  If you have new information that supports a life expectancy of 24 months or less, please submit it for our review and we will gladly reassess your claim for the Accelerated Benefit.

(4/19/18 Crowe Decl. ¶ 3, Ex. 24; 10/25/17 Bancroft Decl. ¶ 16, Ex. D.)[9]  Ms. Taylor also invited Mr. Bancroft to ask questions and to call her on a toll-free direct dial number.

---

[9] Minnesota Life's June 8, 2017, letter states that Mr. Bancroft was "diagnosed in January 2017."  (4/19/18 Crowe Decl. ¶ 3, Ex. 24; 10/25/17 Bancroft Decl. ¶ 16, Ex. D.)  There is no dispute that Mr. Bancroft's last diagnostic test occurred on January 30, 2017.  (Hu Decl. ¶ 5.)  However, Dr. Hu did not announce her diagnosis until February 1, 2017.  (10/25/17 Bancroft Decl. ¶¶ 5-6; Hu Decl. ¶ 6; Plf. 2d MSJ at 4 ("After having tests conducted in January, on February 1, 2017, [Mr.] Bancroft was informed by Dr. . . . Hu that he had Stage IV Mantle Cell Lymohoma.").)  Indeed, in his first motion for summary judgment, Mr. Bancroft states that he was diagnosed on February 1, 2017.  (Plf. 1st MSJ at 4 ("On February 1, 2017, [Mr.] Bancroft returned . . . for the results of the biopsy and PET/CT. . . . At that time, Dr. Hu diagnosed him with Stage IV Mantle Cell Lymphoma and recommended immediate treatment."); *see also*

ORDER - 12

(*Id.*)  Mr. Bancroft did not contact Minnesota Life; nor did he submit any additional information related to his claim prior to filing suit.  (*See* Bancroft Dep. at 95:1-23.)

In the letter, Minnesota Life did not refer to Dr. Shapland's review of Mr. Bancroft's claim or her use of the "90% certainty" standard for life expectancy in evaluating Mr. Bancroft's medical information.  (*See* 4/19/18 Crowe Decl. ¶ 3, Ex. 24; 10/25/17 Bancroft Decl. ¶ 16, Ex. D.)  The claims examiner who handled Mr. Bancroft's claim did not seek an independent medical review prior to sending the letter.  (4/18/18 Crowe Decl. ¶ 3 (attaching excerpts of the March 28, 2018 deposition of Sarah Taylor) ("Taylor Dep.") at 22:24-23:1 ("Q:  Have you ever sought independent medical verification of any claim you've processed?  A:  Nope.").)  Indeed, she testified that she does not know what such a review entails.  (*Id.* at 22:21-23 (Q:  . . . You don't know what independent medical review entails?  A:  No.").)

**F.    Mr. Bancroft's Suit**

Although the ABPR provides that "[i]n the case of a difference of opinion, the insured has the right to mediation or binding arbitration" (10/25/17 Bancroft Decl. ¶ 16, Ex. A at 12), Mr. Bancroft demanded neither after receiving Minnesota Life's June 8, 2017, letter.[10]  Instead, Mr. Bancroft engaged counsel, and on June 22, 2017, he filed and

//

_____

Compl. ¶ 16 ("On or around February 1, 2017, [Mr.] Bancroft returned to the Poly Clinic for the results of the biopsy and PET/CT.  At that time, Dr. Hu diagnosed him with stage IV mantle cell lymphoma and recommended immediate treatment.").)

[10] During oral argument, Mr. Bancroft's counsel conceded that Mr. Bancroft did not request either mediation or binding arbitration following his receipt of Minnesota Life's June 8, 2017, letter.

served a 20-day notification sheet under the Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015. (*See* 10/25/17 Bancroft Decl. ¶ 16, Ex. E; *see also* 4/19/18 Crowe Decl ¶ 2.) Minnesota Life admits that it received Mr. Bancroft's 20-day IFCA notice (Compl. ¶ 44; Ans. ¶ 44) but did not respond within the 20-day notice period (4/19/18 Crowe Decl. ¶ 2).

Mr. Bancroft filed suit against Minnesota Life in King County Superior Court on August 2, 2017. (*See* Compl.) He alleges claims for (1) breach of contract (*id.* ¶¶ 46-48), (2) breach of the covenant of good faith and fair dealing (*id.* ¶¶ 49-51), (3) negligence (*id.* ¶¶ 52-54), (4) insurance bad faith (*id.* ¶¶ 55-58), (5) breach of Washington's Consumer Protection Act ("CPA"), RCW ch. 19.86 (*id.* ¶¶ 59-63), (6) breach of Washington's IFCA (*id.* ¶¶ 64-67), and (7) declaratory relief (*id.* ¶¶ 68-71). Minnesota Life removed the action to this court on August 30, 2017. (Notice of Rem. (Dkt. # 1).)

On October 25, 2017, Mr. Bancroft filed an early motion for summary judgment. (Plf. 1st MSJ (Dkt. # 7).) Along with his motion, Mr. Bancroft filed a declaration from Dr. Cowan dated October 19, 2017. (*See* 10/25/17 Cowan Decl.) Pursuant to Federal Rule of Civil Procedure 56(d), the court denied the motion without prejudice to refiling, if appropriate, after Minnesota Life had an opportunity obtain discovery. (2/21/18 Order (Dkt. # 26) at 12.)

## G. Dr. Shapland's Second Review of Mr. Bancroft's Claim

After receiving Dr. Cowan's October 19, 2017, declaration, Dr. Shapland reevaluated Mr. Bancroft's life expectancy as of November 1, 2017. (5/7/18 Shapland Decl. ¶¶ 8-9.) She reviewed additional medical literature, which she concluded supported her original opinion. (*Id.* ¶ 8; 4/19/18 Crowe Decl. ¶ 3, Ex. 22 at 1.) She noted that in his

declaration, Dr. Cowan "acknowledged that the median survival using the biologic MIPI with a high risk MIPI score was 37 months and that using the non-biologic MIPI with a high risk MIPI score provided a median survival of 29 months 'for individuals with similar factors as Mr. Bancroft.'" (5/7/18 Shapland Decl. ¶ 8 (quoting 10/25/17 Cowan Decl. ¶ 13).) Dr. Shapland interpreted Dr. Cowan's statement to mean that he was confirming that Mr. Bancroft shared similarities with individuals who had a median survival of 29 months using the non-biologic MIPI. (*See id.*) Dr. Shapland also interpreted Dr. Cowan's declaration as suggesting that Mr. Bancroft had experienced a negative reaction to treatment. (*Id.* ¶ 9.) Mr. Bancroft also testified in October 2017 that he had experienced "severe reactions" to some of his treatments and that Dr. Cowan had needed to adjust his treatments accordingly. (*See* 10/25/17 Bancroft Decl. ¶ 8.) Due to the passage of nearly five additional months since her original opinion in early June 2017, her acceptance of Dr. Cowan's October 2017 statement "that individuals with similar factors as Mr. Bancroft" had a (non-biologic) MIPI prognosis of 29 months, her inference that the "marked" improvement anticipated by Dr. Cowan had not occurred, and the fact that Mr. Bancroft may have taken a turn for the worse or there may have been negative developments in Mr. Bancroft's treatment, Dr. Bancroft used the 29-month median survival (non-biologic MIPI) and determined based on a 90% certainty standard that as of November 1, 2017, Mr. Bancroft's life expectancy was 24 months or less. (5/7/18 Shapland Decl. ¶ 9; Shapland Dep. at 108:3-122:6.) Minnesota Life paid Mr. Bancroft $384,000.00 the next day. (Plf. 2d MSJ at 12; Def. MSJ at 10.)

//

# III.   ANALYSIS

On April 19, 2018, Mr. Bancroft filed a second motion for summary judgment on liability for his claims of (1) breach of contract; (2) bad faith; (3) breach of Washington's IFCA; and (4) breach of Washington's CPA.  (*See generally* Plf. 2d MSJ.)  On May 7, 2018, Minnesota Life filed its response to Mr. Bancroft's motion and a cross motion for summary judgment in its favor.  (*See generally* Def MSJ.)  The court considers both motions after resolving an evidentiary issue.

## A.   Admissibility of Don Kelley's Expert Testimony

The court first addresses a preliminary issue concerning the admissibility of certain evidence.  In its reply memorandum, Minnesota Life objects to the admissibility of Mr. Don Kelley's opinions and testimony.  (Def. Reply (Dkt. # 49) at 5-6.)  Mr. Kelley is Mr. Bancroft's expert witness on insurance issues.  (*See* Kelley Decl. (Dkt. # 48) ¶ 2, Ex. J (attaching Mr. Kelley's expert witness report).)  In response to Minnesota Life's objection, Mr. Bancroft filed a surreply arguing that Minnesota Life's request to exclude Mr. Kelley's testimony "was improperly presented in reply and otherwise in violation of the local rules."  (Plf. Surreply (Dkt. # 51) at 1.)  Mr. Bancroft maintains that he had an inadequate opportunity to respond to Minnesota Life's objection.  (*See id.*)

Before considering the admissibility of Mr. Kelley's testimony, the court first addresses Mr. Bancroft's procedural objection.  Local Rule LCR 7(d)(4) states that "[e]xcept upon a showing of good cause, any motion in limine shall be filed as one motion."  Local Rules W.D. Wash. LCR 7(d)(4).  Mr. Bancroft apparently objects that Minnesota Life did not file its objection to Mr. Kelley's testimony in a separate omnibus

motion containing all of its motions in limine as required by this local rule.  (*See* Plf. Surreply at 1.)  However, Local Rule LCR 7 begins with the following proviso:  "Unless otherwise provided by rule or court order, motions shall be noted for consideration as follows."  *Id.*, LCR 7.  Thus, the directive in Local Rule 7(d)(4) that all motions in limine shall be filed as one motion, is cabined by the provisio—"[u]nless otherwise provided by . . . court order."  *See id.*  Here, the court expressly separated motions objecting to expert witness testimony from all other motions in limine in its scheduling order.  (*See* Sched. Order (Dkt. # 20) at 1.)  The court's scheduling order requires parties to file all dispositive motions and motions challenging expert witness testimony by July 11, 2018, but all other motions in limine by August 28, 2018.  (*Id.*)  Thus, although it was not filed as a separate motion, Minnesota Life's June 1, 2018, objection to Mr. Kelley's testimony was timely and not improperly segregated from Minnesota Life's other motions in limine.

Mr. Bancroft also objects that Minnesota Life raised its challenge to Mr. Kelley's testimony for the first time in its reply memorandum.  (Plf. Surreply at 1.)  Mr. Bancroft, however, did not rely upon Mr. Kelley's testimony until his third memorandum addressing the parties' cross motions.  (*See* Plf. Resp. (Dkt. # 46) at 4, 11, 17 n.15, 24.) Thus, Minnesota Life's first opportunity to address the admissibility of Mr. Kelley's expert opinions was in its reply memorandum.  (*See* Def. Reply at 5-6).[11]  "A trial court

_____

[11] Mr. Bancroft filed his motion for summary judgment on April 19, 2018.  (*See* Plf. 2d MSJ.)  Minnesota Life filed its response and cross motion on May 7, 2018.  (*See* Def. MSJ.)  Mr. Bancroft filed a reply memorandum to his own motion for summary judgment on May 11, 2018. (*See* Plf. Reply.)  On May 29, 2018, Mr. Bancroft filed an additional response memorandum to Minnesota Life's cross motion.  (*See* Plf. Resp.)  On June 1, 2018, Minnesota Life filed a reply

can only consider admissible evidence in ruling on a motion for summary judgment."

*Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Thus, it was

substantively proper for Minnesota Life to raise its objections to the admissibility of Mr.

Kelley's expert testimony in response to Mr. Bancroft's reliance thereon.

In any event, Mr. Bancroft is not prejudiced by the manner in which Minnesota

Life raised its objection. Mr. Bancroft filed a surreply and therefore had the opportunity

to address Minnesota Life's objection. (*See* Plf. Surreply.) Further, Mr. Bancroft

provided the entire transcript of Mr. Kelley's deposition testimony to the court (*see*

6/4/18 Frost Decl. (Dkt. # 52) ¶ 2, Ex. A (attaching a transcript of Mr. Kelley's

deposition); *see also* Plf. Surreply at 1 ("To any extent the Court considers defendant's

request to exclude Mr. Kelley's testimony, the Court should have full opportunity to

review Mr. Kelley's full deposition testimony as the excerpts provided by [Minnesota

Life] are incomplete and/or misleading as to Mr. Kelley's full testimony provided.")),

and the court has reviewed it. Further, the court specifically notified the parties to be

"prepared to address the admissibility of the opinions and testimony" of Mr. Kelley at

oral argument. (*See* 7/10/18 Order (Dkt. # 60).) Mr. Bancroft's counsel addressed the

issue orally and provided the court with a hand-out highlighting areas of Mr. Kelley's

expert opinion report that Mr. Bancroft's counsel concedes are not admissible. (*See*

Report (Dkt. # 63).) Accordingly, Mr. Bancroft has had "ample opportunity" to address

//

_____

memorandum in support of its cross motion. (*See* Def. Reply.) Finally, on June 4, 2018, Mr.
Bancroft filed his surreply. (*See* Surreply.)

Minnesota Life's objections (Plf. Surreply at 1), and he is not prejudiced by the court's consideration of the issue.

The court now turns to the substance of Minnesota Life's objection. Minnesota Life's objections to Mr. Kelley's testimony fall into two categories. First, Minnesota Life argues that Mr. Kelley is not qualified to critique various medical opinions as he does. (Def. Reply at 5-6.) Second, Minnesota Life objects that Mr. Kelley's expert opinion report is replete with legal conclusions that are not helpful to the trier of fact. (*Id.*)

Federal Rule of Evidence 702 requires that a prospective witness be "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). The Ninth Circuit has defined this as the threshold issue in determining whether a witness may come "before the jury cloaked with the mantle of an expert" under Rule 702, and has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of Rule 702." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001). In addition, the interpretation of an insurance policy is a question of law for the court. *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Thus, the Ninth Circuit has expressly stated that expert testimony from an attorney "cannot be used to provide legal meaning or interpret . . . [insurance] policies as written." *Id.*

The lion's share of Mr. Kelley's expert opinion consists of his critique of Dr. Shapland's medical opinion and her review of the medical literature underpinning her

opinion and his analysis of Dr. Cowan's prognosis for Mr. Bancroft and the medical literature underpinning that prognosis. (*See* Kelley Decl. ¶ 2, Ex. J at 7-9.) But Mr. Kelley is not a medical doctor and asserts no medical expertise. (*Id.* at 1.) Instead, he is an attorney who specializes in insurance matters. (*Id.*) Indeed, Mr. Bancroft's counsel admitted during oral argument that Mr. Kelley has no medical qualifications. Mr. Kelley is, therefore, unqualified to opine on the adequacy of either Dr. Shapland's or Dr. Cowan's medical opinions or the adequacy of their review of the medical literature. *See, e.g.*, *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (rejecting the Social Security Commissioner's suggestion that despite the medical opinion, the medical records supported the ALJ's determination, and holding that an ALJ is "simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination"); *see also Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194-95 (10th Cir. 1992) (affirming the trial court's determination that an attorney with "some education and training in the field" was not qualified "as an expert in the securities area").

During oral argument, Mr. Bancroft's counsel submitted a copy of Mr. Kelley's expert witness report with certain portions highlighted in gray. (*See* Report.) Mr. Bancroft's counsel conceded that the highlighted portions of Mr. Kelley's expert report are not admissible. (*See id.*) Mr. Kelley's first opinion is that "Minnesota Life failed to conduct a reasonable investigation of the relevant available information before denying [Mr.] Bancroft's claim." (*Id.* at 7.) Mr. Bancroft concedes that the first paragraph of the analysis supporting this opinion is inadmissible. (*Id.* at 7-8.) The court, however,

excludes the entire portion of the report underpinning this opinion. The entire analysis

behind this opinion is intertwined with Mr. Kelley's improper evaluation of Dr. Cowan's

and Dr. Shapland's medical opinions. Indeed, Mr. Kelley even includes this remarkable

admission: "As a lay person, not particularly trained in medicine, I would think that a

person taking the cocktail of medications [Mr.] Bancroft was taking would be expected to

improve." (*Id.* at 8.) In this statement, Mr. Kelley acknowledges his complete lack of

medical expertise. Because his opinion concerning the adequacy of Minnesota Life's

investigation is entwined with his analysis of Dr. Shapland's and Dr. Cowan's medical

opinions, he is not qualified to offer the opinion at issue. Accordingly, the court excludes

Mr. Kelley's first opinion.

Mr. Kelley's second opinion is that "Minnesota Life failed to fairly and

objectively interpret the information it received before denying [Mr.] Bancroft's claim."

(*Id.* at 8.) Mr. Bancroft's counsel concedes that the first paragraph of Mr. Kelley's

analysis underlying this opinion, which contains Mr. Kelley's evaluation of Dr.

Shapland's and Dr. Cowan's medical opinions, is inadmissible. (*See id.* at 8-9.) Mr.

Kelley's entire opinion, however, concerning Minnesota Life's interpretation of the

information at issue is entangled with his analysis of the doctors' medical opinions and

cannot be divorced from it. (*See id.*) The court, therefore, excludes the entire opinion.

Mr. Kelley's third opinion is that "Minnesota Life failed to administer [Mr.]

Bancroft's claim in accordance with the express provisions of his Policy and in

accordance with the insurance industry custom and practice." (*Id.* at 9.) Mr. Bancroft's

counsel again concedes that the majority of this opinion is inadmissible. (*See id.* at 9-10.)

Indeed, the analysis underlying Mr. Kelley's opinion consists extensively of how he believes the Policy and ABPR should be interpreted. (*See id.*) As discussed above, expert testimony from an attorney cannot be used to provide legal meaning or interpret insurance policies; policy interpretation is an issue of law for the court. *See McHugh*, 164 F.3d at 454. The court concludes that the remainder of the analysis underlying Mr. Kelley's opinion is also inadmissible. Once again, Mr. Kelley's analysis is based on the adequacy of Dr. Shapland's medical opinion, and as discussed above, he is unqualified to perform this analysis.

Mr. Kelley's fourth opinion is that "Minnesota Life misrepresented a critical fact as the basis for denying [Mr.] Bancroft's claim." (Report at 11.) Mr. Bancroft's attorney believes that this opinion and its supporting analysis is admissible. (*See id.*) The court, however, disagrees. Mr. Kelley's opinion is based entirely on his assessment of Dr. Shapland's analysis of the medical literature underpinning her medical opinions in this case. As repeatedly stated above, he is unqualified as a lawyer without medical training to conduct this analysis.

Mr. Kelley states his final opinion as follows: "For all the above reasons, it is my opinion that Minnesota Life failed to give [Mr.] Bancroft's interests as much consideration as they did their own." (*Id.*) Because the court has excluded all of Mr. Bancroft's prior opinions either because he lacks the necessary medical expertise or because he offers legal opinions or interpretations of the Policy or ABPR, there is no basis or foundation remaining to undergird this last opinion. Accordingly, the court finds that his last opinion is inadmissible as well. In sum, the court excludes the entirety of Mr.

Kelley's opinions.  Accordingly, the court will not consider Mr. Kelley's expert opinions or testimony when evaluating the cross motions at issue.

**B.     Standard of Review for Summary Judgment of Cross Motions**

Summary judgment is proper where, viewing the evidence and inferences therefrom in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those that may affect the outcome of the suit under governing law, and an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).  The court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (internal quotation marks omitted) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and*

//

//

//

*Procedure* § 2720 (3d ed. 1998)).

**C.      Breach of Contract**

The party seeking to establish coverage under an insurance contract—here, Mr. Bancroft—bears the burden of proving that coverage under the policy is triggered.  *See Pleasant v. Regence BlueShield*, 325 P.3d 237, 243 (Wash. Ct. App. 2014) (citing *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 983 P.2d 707, 709 (Wash. Ct. App. 1999), *as amended on reconsideration* (Oct. 12, 1999)).  A breach of contract claim against an insurance company "depend[s] on proof of four common elements:  duty, breach, causation, and damages."  *Baldwin v. Silver*, 269 P.3d 284, 289 (Wash. Ct. App. 2011) (citing *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995) ("A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant.")).

Mr. Bancroft argues that Minnesota Life breached the ABPR in two ways.  First, he argues that Minnesota Life breached the ABPR when it did not pay his claim in June 2017.  Second, he argues that Minnesota Life breached the ABPR by failing to provide him with either mediation or binding arbitration in June 2017.  The court considers each argument in turn.

1.      Evidence that Satisfies Minnesota Life that the Insured's Life is 24 Months or Less

Mr. Bancroft seeks summary judgment that Minnesota Life breached the ABPR because, despite providing "information sufficient to demonstrate that his life expectancy [wa]s 24 months[,] . . . includ[ing] certification by a physician," Minnesota Life still

denied his claim on June 8, 2017. (Plf. 2d MSJ at 13.) Mr. Bancroft argues that his doctor's "prognosis plainly falls within the policy terms and the [ABPR] benefit should have been paid." (*Id.*) Mr. Bancroft's argument, however, ignores the plain language of the ABPR.[12] Minnesota Life's ABPR does not state that it will pay the benefit based on a physician's certification that the insured's life expectancy is 24 months or less. Rather, the ABPR states:

> We must be given evidence that satisfies us that the insured's life expectancy, because of sickness or accident, is twenty-four months or less. That evidence must include certification by a physician.

(11/06/17 Marisseau Decl. ¶ 4, Ex. A.)[13] Based on this language, Minnesota Life argues that Mr. Bancroft failed to provide evidence that satisfied Minnesota Life. (Def. MSJ at 11-16; *see also* Def. Reply at 2 ("[Mr. Bancroft's] breach of contract claim fails because he did not furnish, in June 2017, 'evidence that satisfies [Minnesota Life] that the insured's life expectancy . . . is twenty-four months or less.'") (quoting 4/19/18 Crowe

//

---

[12] Neither party asserts that the language of the ABPR is ambiguous. (*See* Def. MSJ at 11 (stating that Mr. Bancroft concedes the ABPR is unambiguous); Plf. 2d MSJ at 13 ("The ABPR is clear."); Plf. Resp. at 14 ("The ABPR is clear."); *see also* Plf. Reply at 2, 5 (arguing that, to the extent the court deems portions of the ABPR to be ambiguous, those portions should be interpreted in Mr. Bancroft's favor, but not arguing that the ABPR is ambiguous).) In Washington, insurance policies are construed as contracts. *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). A court must consider an insurance policy as a whole and give it a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (internal quotation marks omitted) (quoting *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000)). If the language of an insurance policy is clear and unambiguous, the court must enforce the policy as written; a court may not modify it or create ambiguity where none exists. *Id.* Here, the court concludes that there is no ambiguity and thus enforces the policy as written.

[13] The policy defines the terms "we" and "us" as Minnesota Life. (4/19/18 Crowe Decl. ¶ 3, Ex. 19 at ML 0031.)

Decl. ¶ 3, Ex. 19 at ML 0037).)  Thus, Minnesota Life argues that not only is Mr.

Bancroft not entitled to summary judgment on his breach of contract claim, but also that

the court should enter summary judgment in Minnesota Life's favor instead.  (*See* Def.

Reply at 2 ("Plaintiff . . . fail[s] to raise a genuine dispute of material fact as to any of his

claims.").)

The Washington Supreme Court has examined language similar to the policy

provision at issue here.  In *Conway v. Minnesota Life Insurance Co.*, the insured failed to

pay a premium on his life insurance policy, and the policy lapsed.  112 P. 1106, 1107

(Wash. 1911).  The insured applied for reinstatement but was required under the policy to

"furnish[] . . . [the insurer] satisfactory evidence that he is in good health."  *Id*.  The

company declined to reinstate the policy because it found the insured's evidence

unsatisfactory.  *Id*.  The Washington Supreme Court held that the policy language

provided the insurance company with the discretion to decide whether the insured's proof

was sufficient.  *Id*.  In other words, the Court determined that the policy required the

insured to provide "such satisfactory evidence of good heath meaning satisfactory to the

company, and giving [the company] the right of rejection if, in the exercise of the

discretion vested in it, such evidence was not satisfactory."  *Id*.  *Conway* supports

Minnesota Life's position that, under the ABPR's language, Minnesota Life has the

discretion to determine if the evidence of Mr. Bancroft's life expectancy was satisfactory

or not.

More recently, the Eleventh Circuit also considered similar policy language, and

its decision aligns with *Conway*.  In *Florida Tube Corp. v. MetLife Insurance Co.*,

beneficiaries of a life insurance policy brought suit against the insurer, alleging that the insurer should pay them under the policy because circumstantial evidence of the insured's death in a solo plane accident satisfied the policy's requirements. 603 F. App'x 904, 905 (11th Cir. 2015). After the insurer rejected the beneficiaries' claim and the decedent's death certificate as proof of death that met the requirements of the policy, the beneficiaries submitted a copy of the National Transportation Safety Board's ("NTSB") report, "denominating it as sufficient proof of death." *Id.* at 906. The insurer rejected the NTSB report as insufficient proof as well, and the beneficiaries filed suit. *Id.* The Eleventh Circuit held that the policy's "proof satisfactory to us" term was unambiguous and had "only one reasonable interpretation." *Id.* at 907. The court held that the plain meaning of "proof satisfactory to us" means "proof satisfactory to MetLife," and that applying that meaning, the insurer was within its discretion to deny coverage when the beneficiaries gave the insurer circumstantial proof of death that "it deemed unsatisfactory." *Id.*

Mr. Bancroft correctly notes that Washington law concerning the relationship between insureds and their insurance companies has developed since *Conway.* Specifically, Mr. Bancroft argues that in Washington "an insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests." *Van Noy v. State Farm Mut. Auto. Ins. Co*., 16 P.3d 574, 579 (2001) (quoting *Tank v. State Farm Fire & Cas. Co*., 715 P.2d 1133, 1136 (1986)). Mr. Bancroft argues that this principle prohibits Minnesota Life from demanding evidence of life expectancy that "satisfies" Minnesota Life in its discretion alone, but rather must consider its insured's interests on

an equal footing when determining whether the insured's evidence of life expectancy is satisfactory.  (*See* Plf. Reply at 5-6.)

The court, however, finds no case law to support the notion that an insurer's duty to deal fairly with an insured or to place an insured's interests on equal footing with its own requires a rewriting of unambiguous policy language.  Nevertheless, the court recognizes that when an insured has a contractual right that depends on the insured's furnishing of evidence or proof which is "satisfactory to the company" or "satisfies" the company, the weight of authority applies an objective standard.  *See* 29 John Alan Appleman, *Appleman on Insurance*, § 179.03[D][4] (2d ed. 2006).  In other words, "the evidence need only be that which would be satisfactory to a reasonable insurer."  *Id.* Without so ruling, but for the purpose of deciding the present cross motions, the court assumes that, in light of its more recent articulation of an insurer's duty to "deal fairly" with its insured, *see St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 669 (Wash. 2008), the Washington Supreme Court would apply this higher standard if it were considering the policy language at issue in *Conway* today.  Even assuming the application of a standard higher than the one articulated in *Conway*, however, there is no genuine dispute of material fact that Minnesota Life did not breach the contract by provisionally denying Mr. Bancroft's claim on June 8, 2017.

Minnesota Life provisionally denied Mr. Bancroft's claim because Dr. Cowan relied upon an obsolete study in opining that Mr. Bancroft had a life-expectancy of 24 months or less and ignored a more recent and scientifically sound measure—Mr. Bancroft's MIPI score. *See infra* §§ II.C, D.  Further, even Dr. Cowan—Mr. Bancroft's

treating oncologist—concedes that reasonable estimates of Mr. Bancroft's life expectancy

could be calculated by using either the 29-month non-biologic MIPI or the 37-month

biologic MIPI. (Cowan Dep. at 61:19-62:2; 62:24-63:8.) Indeed, all of the medical

experts in this case—Mr. Bancroft's treating physician, Minnesota Life's reviewing

doctor, and Minnesota Life's medical expert witness—agree on this point.[14] (*See id.*; *see*

*also* Grinblatt Decl. ¶¶ 6, 10; Shapland Dep. at 71:14-17.) Moreover, Mr. Bancroft

provides no expert medical testimony to the contrary. Thus, Minnesota Life had

objective reasons to deny an accelerated payment of Mr. Bancroft's life insurance

benefits on June 8, 2017. The most recent medical literature did not support Dr. Cowan's

prognosis of a life expectancy of 24 months or less, and Mr. Bancroft's MIPI score

indicated that his life expectancy was longer than 24 months. Thus, even considering the

policy language at issue—that Mr. Bancroft must submit "evidence that satisfies"

Minnesota Life—under the standard of a reasonable insurer, there is no genuine dispute

//

---

[14] Dr. Shapland also testifies that she believes that both her opinion—that Mr. Bancroft had a life expectancy of greater of than 24 months at the time he initially submitted his claim—and Dr. Cowan's prognosis—that Mr. Bancroft had a life expectancy of 24 months or less—were reasonable. (Shapland Dep. at 71:14-17.) This fact, however, does not support the notion that Minnesota Life breached the contract by denying Mr. Bancroft's claim due to the specific policy language at issue here. Just because Dr. Shapland did not find Dr. Cowan's opinion to be unreasonable does not mean that Mr. Bancroft fulfilled the ABPR's requirement of "giv[ing] evidence that satisfies [Minnesota Life] that the insured's life expectancy, because of sickness or accident, is twenty-four months or less." (*See* 11/06/17 Marisseau Decl. ¶ 4, Ex. A.) This is particularly so because Minnesota Life explained to Mr. Bancroft that Dr. Cowan's opinion—although perhaps not unreasonable—was not supported by the medical literature. (*See* 4/19/18 Crowe Decl. ¶ 3, Ex. 24 (attaching the June 8, 2017, letter from Minnesota Life to Mr. Bancroft, stating: "Your doctor did indicate on the claim form that your condition was terminal and provided a life expectancy of 24 months. Per medical literature, median survival for your diagnosis is 37 months.").)

of material fact that Minnesota Life did not breach the ABPR by provisionally denying

Mr. Bancroft's claim on June 8, 2017.

Mr. Bancroft nevertheless asserts that Dr. Shapland's adoption of the 29-month

non-biologic MIPI for calculating Mr. Bancroft's life expectancy when she re-evaluated

his claim in November 2017, is evidence that Minnesota Life breached the ABPR when it

denied his claim on June 8, 2017. (Plf. Reply at 3 (citing Shapland Dep. at

109:18-110:13).) Mr. Bancroft argues that if Minnesota Life had applied the non-

biologic MIPI in June, when it first assessed Mr. Bancroft's claim, it would have

concluded that Mr. Bancroft's life expectancy was 24 months or less. (*Id.*) However,

Mr. Bancroft's argument is based on faulty arithmetic. Mr. Bancroft admits that he was

diagnosed on February 1, 2017.[15] Thus, using the 29-month non-biologic MIPI score, at

the time Dr. Cowan signed the Attending Physician's Statement on May 26, 2017, or at

the time Minnesota Life denied Mr. Bancroft's claim on June 8, 2017, Mr. Bancroft

would not have had a life expectancy of 24 months or less. As of May 26, 2017, Mr.

//

//

---

[15] Mr. Bancroft admitted in his complaint that Dr. Hu diagnosed him when he returned to the clinic for his biopsy and PET/CT results. (*See* Compl. ¶ 16 ("On or around February 1, 2017, [Mr.] Bancroft returned to the Poly Clinic for the results of the biopsy and PET/CT. At that time, Dr. Hu diagnosed him with stage IV mantle cell lymphoma and recommended immediate treatment.") Factual assertions in pleadings, unless amended, are considered judicial admissions binding on the party who made them. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). "Such admissions, which 'have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact,' are binding on both the parties and the court." *United States v. Davis*, 332 F.3d 1163, 1168 (9th Cir. 2003) (quoting *Lacelaw*, 861 F.2d at 226). In addition, Mr. Bancroft testified that he "returned to the Poly Clinic for the results of the biopsy and PET/CT" on February 1, 2017. (10/25/17 Bancroft Decl. ¶ 5.) Thus, there is no genuine dispute that Mr. Bancroft was diagnosed on February 1, 2017.

Bancroft would have had a life expectancy slightly greater than 25 months; on June 8, 2017, his life expectancy would have been slightly less than 25 months.[16]  But in either event, it would have been more than twenty-four months.  (*See* 11/06/17 Marisseau Decl. ¶ 4, Ex. A.)  Thus, Dr. Shapland's adoption of the 29-month non-biologic MIPI score in November 2017 does not raise a genuine dispute of material fact concerning Mr. Bancroft's breach of contract claim preventing the entry of summary judgment in Minnesota Life's favor.

Mr. Bancroft, however, also takes umbrage with Minnesota Life's application of a "90% confidence" or "90% certainty" factor in assessing its insureds' life expectancy and implies that Minnesota Life's use of this factor violates its duty to give "equal consideration in all matters" to Mr. Bancroft's interests.  (*See* Plf. 2d MSJ at 14; Plf. Reply at 3; Plf. Resp. at 17-18); *see Van Noy*, 16 P.3d at 579.  Instead, Mr. Bancroft asserts that Minnesota Life and Dr. Shapland should have applied a "more likely than not standard."  (*See* Plf. 2d MSJ at 14; Plf. Reply at 5-8; Plf. Resp. at 15-18.)  Mr. Bancroft, however, fails to raise a genuine dispute of material fact preventing the entry of summary judgment in Minnesota Life's favor because Dr. Shapland testified that—irrespective of whether she applied the "90% certainty" standard or a "more likely than not" standard, her opinion concerning Mr. Bancroft's life expectancy would be the same.  (5/7/18 Shapland Decl. ¶ 10 ("In looking at whether the evidence presented in the May 26 claim

---

[16] Even if the court assumed that Dr. Hu diagnosed Mr. Bancroft on January 30, 2017—the date of his last medical test in January—the court's analysis remains unchanged because on June 6, 2017, Mr. Bancroft would still have more than "twenty-four months or less" in life expectancy.  *See supra* n.9 & n.15.

showed that Mr. Bancroft's life expectancy was 24 months or less, my opinion is the same regardless of whether . . . I apply a 'more likely than not' or a 90% certainty standard.").) Mr. Bancroft has not provided any medical testimony to counter Dr. Shapland's testimony in this regard. (*See generally* Dkt.) The court does not hold that Minnesota Life was required to apply a "more likely than not" standard. But, even if Mr. Bancroft is correct, the application of a "more likely than not" standard would have made no difference here. Thus, Mr. Bancroft's objection to the "90% certainty" factor does not raise a genuine dispute of material fact prohibiting the court's entry of summary judgment in Minnesota Life's favor on his breach of contract claim concerning this clause of the ABPR.

In any event, as discussed above, the policy language plainly stated that Mr. Bancroft had to submit "evidence that satisfies [Minnesota Life]" of his life expectancy. (11/06/17 Marisseau Decl. ¶ 4, Ex. A at ML 0037.) Thus, Minnesota Life's application of a "90% confidence" or a "90% certainty" factor was not a violation of the terms of the contract—particularly where Mr. Bancroft's own oncologist agreed that use of Mr. Bancroft's MIPI score for estimating his life expectancy, as Dr. Shapland did, was reasonable. (*See* Cowan Dep. at 61:19-62:2; 62:24-63:8.)

In sum, the court grants Minnesota Life's motion for summary judgment on Mr. Bancroft's claim for breach of contract concerning the ABPR's clause requiring evidence satisfying Minnesota Life that Mr. Bancroft's life expectancy is 24 months or less. The court denies Mr. Bancroft's motion for summary judgment with respect to the same clause.

2. <u>Minnesota Life's Right to Obtain an Independent Medical Examination and Mr. Bancroft's Right to Alternative Dispute Resolution</u>

Mr. Bancroft also argues that Minnesota Life breached the ABPR by "refus[ing] to conduct an 'independent medical verification' or to allow for any sort of alternative dispute resolution prior to denying [Mr.] Bancroft's claim." (Plf. 2d MSJ at 14; *see also* Plf. Resp. at 18 ("Minnesota Life denied [Mr.] Bancroft's claim prior to allowing him his right to present his arguments using alternative dispute resolution provided under the policy and as required by Washington law.").) Minnesota Life opposes Mr. Bancroft's motion and also argues that it is entitled to summary judgment on Mr. Bancroft's claim concerning this ABPR clause. (Def. MSJ at 15-16.)

The court begins with the language of the ABPR, which states in relevant part:

**Do we retain the right to obtain independent medical verification?**

Yes. We retain the right to have the insured medically examined at our own expense to verify the insured's medical condition.

(10/25/17 Bancroft Decl. ¶ 16, Ex. A at 12 (bolding in original).) The ABPR also states:

We reserve the right to ask for independent medical verification of a terminal condition. In the case of a difference of opinion, the insured has the right to mediation or binding arbitration conducted by a disinterested third party who has no ongoing relationship with either party.

(*Id.*) Under the plain language of the policy, Minnesota Life had no obligation to conduct an independent medical verification or examination of Mr. Bancroft to verify his condition. (*See id.*) The ABPR plainly states that Minnesota Life "retain[s]" or "reserve[s]" the right to ask for such a verification but that it was not required to do so. (*Id.*) Because the policy language is clear and unambiguous, the court enforces it as

written. *See Quadrant Corp.*, 110 P.3d at 737 ("Most importantly, if the policy language is clear and unambiguous, we must enforce it as written; we may not modify it or create ambiguity where none exists."). Thus, to the extent that Mr. Bancroft asserts that he is entitled to summary judgment because Minnesota Life violated the ABPR by "refus[ing] to conduct an 'independent medical verification'" (Plf. 2d MSJ at 18), the court denies Mr. Bancroft's motion and grants summary judgment to Minnesota Life on that issue.

Mr. Bancroft, however, also argues that Minnesota Life breached the ABPR by failing to allow him to engage in mediation or arbitration over the dispute between Dr. Cowan and Dr. Shapland concerning the length of his life expectancy. (Plf. 2d MSJ at 14-15.) Minnesota Life argues that Mr. Bancroft's right to mediation or arbitration arises only in the event that Minnesota Life seeks an independent medical verification and that doctor's opinion is in conflict with the insured's doctor's opinion. (Def. MSJ at 15.) Because it did not seek independent medical verification of Mr. Bancroft's condition, Minnesota Life argues that it had no obligation to engage in alternative dispute resolution with Mr. Bancroft. (*See id.*)

The court agrees with Mr. Bancroft that, under the plain language of the ABPR, Mr. Bancroft's right to alternative dispute resolution was not contingent upon Minnesota Life's invocation of its right for an independent medical examination of Mr. Bancroft. In this case, Dr. Cowan and Dr. Shapland had a "difference of opinion," and this difference alone triggered Mr. Bancroft's "right to mediation or binding arbitration conducted by a disinterested third party" under the ABPR. (*See* 10/25/17 Bancroft Decl. ¶ 16, Ex. A at 12.) The problem with Mr. Bancroft's claim for breach of this provision, however, is that

he never invoked his right or informed Minnesota Life that he would like to mediate or arbitrate. Indeed, his counsel admitted during oral argument that Mr. Bancroft never asked for mediation or any other kind of alternative dispute resolution. Instead, upon receiving Minnesota Life's June 8, 2017, letter, Mr. Bancroft hired counsel, sent a 20-day IFCA notice dated June 22, 2017, to Minnesota Life (*see* 10/25/17 Frost Decl. (Dkt. # 22) ¶ 2, Ex. E), and filed suit on August 2, 2017 (*see* Compl.).

The court found no case law interpreting a similar alternative dispute resolution clause. Nevertheless, in Washington, "'an insurer cannot be expected to anticipate when or if an insured will make a claim for coverage; the insured must affirmatively inform the insurer that its participation is desired.'" *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 873 (Wash. 2008) (quoting *Unigard Ins. Co. v. Leven*, 983 P.2d 1155, 1160 (Wash. Ct. App. 1999), *as amended* (Apr. 24, 2000)). The court, therefore, concludes that Mr. Bancroft was required to inform Minnesota Life that he wished to invoke his right to alternative dispute resolution under the ABPR. He did not do so. Therefore, Minnesota Life did not breach this provision of the ABPR by not engaging in either mediation or binding arbitration to resolve the dispute. Accordingly, the court grants Minnesota Life's motion for summary judgment on this issue and denies Mr. Bancroft's motion.

In sum, the court grants Minnesota Life's motion for summary judgment that it did not breach the ABPR by failing to conduct an independent medical verification or examination of Mr. Bancroft. The court further grants Minnesota Life's motion for summary judgment on Mr. Bancroft's claim for breach of the alternative dispute

resolution provision of the ABPR.  The court denies Mr. Bancroft's motion on these two

issues.  Accordingly, there is no portion of Mr. Bancroft's breach of contract claim that

remains for trial.

**D.     IFCA**

Under IFCA, "an insured 'who is unreasonably denied a claim for coverage or

payment of benefits by an insurer' may sue to recover actual damages and costs."

*Kabrich v. Allstate Prop. & Cas. Ins. Co.*, 693 F. App'x 524, 526 (9th Cir. 2017) (citing

RCW 48.30.015(1) & *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 479

(Wash. 2017)).  In addition, after finding that an insurer has "acted unreasonably in

denying a claim for coverage or payment of benefits" or violated one of the Washington

Administrative Code ("WAC") sections listed in RCW 48.30.015(5), a court may

increase the total damages award to an amount not to exceed three times the actual

damages and award reasonable attorney's fees and actual and statutory litigation costs.

RCW 48.30.015(2), (3).  However, IFCA does not create an independent cause of action

for regulatory violations in the absence of any unreasonable denial of coverage or

benefits.  *Perez-Crisantos*, 389 P.3d at 483.

The court has granted summary judgment in favor of Minnesota Life on all of Mr.

Bancroft's breach of contract claims.  *See supra* § III.C.  Because there is no IFCA cause

of action in the absence of an unreasonable denial of coverage or payment of benefits,

Mr. Bancroft's IFCA claim cannot survive.  *See Perez-Crisantos*, 389 P.3d at 483.  The

court, therefore, grants summary judgment to Minnesota Life on all aspects of Mr.

*//*

Bancroft's IFCA claim and denies Mr. Bancroft's motion for summary judgment on the same claim.

**E.    Bad Faith**

Claims for insurer bad faith "are analyzed applying the same principles as any other tort:  duty, breach of that duty, and damages proximately caused by any breach of duty.  In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded."  *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc*., 196 P.3d 664, 668 (Wash. 2008) (citing *Mutual of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 169 P.3d 1, 8 (Wash. 2007)).

The fact that the court has granted Minnesota Life's motion for summary judgment on Mr. Bancroft's breach of contract claim does not necessarily eliminate his claim for bad faith with respect to Minnesota Life's handling of Mr. Bancroft's claim under the ABPR.  An insured can prove a claim for bad faith investigation of the insured's claim—as well as a violation of the CPA—regardless of whether the insurer was ultimately correct in determining that coverage did not exist.  *See Coventry Assocs. v. Am. States Ins. Co*., 961 P.2d 933, 937 (Wash. 1998) ("We hold an insured may maintain an action against its insurer for bad faith investigation of the insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist.").

Mr. Bancroft argues that Minnesota Life committed the tort of bad faith because it "failed to conduct a reasonable investigation into the facts of [his] claims."  (Plf. 2d MSJ at 21.)  Mr. Bancroft's bad faith claim focuses on the alleged inadequacy of Dr.

Shapland's evaluation of the medical evidence and literature and the development of her opinion in June 2017, that Mr. Bancroft's life expectancy was greater than 24 months. (*See id.* at 21-22; Kelley Decl. ¶ 2, Ex. J at 7-9.)  As described above, Mr. Kelley is not a doctor and has no medical expertise.  (Kelley Decl. at 1.)  Accordingly, the court excluded this portion of Mr. Kelley's opinion or testimony as inadmissible under Federal Rule of Evidence 702.  *See supra* § III.A.

Moreover, Dr. Cowan testified that Mr. Bancroft's MIPI score was a reasonable basis for estimating his life expectancy and that a prognosis of either 29 or 37 months based on this score was reasonable.  (*See* Cowan Dep. at 61:19-62:2; 62:24-63:8.)  Indeed, as the court has already indicated, there is no admissible medical testimony in the record that Dr. Shapland's use of Mr. Bancroft's MIPI score to determine his life expectancy was unreasonable.  (*See id.*; *see also* Grinblatt Decl. ¶¶ 6, 10; Shapland Dep. at 71:14-17.)  As such, the court concludes that no reasonable juror could conclude that Dr. Shapland's opinion represents a bad faith investigation of Mr. Bancroft's claim or that Minnesota Life's reliance upon her opinion was "unreasonable, frivolous, or unfounded."  *See St. Paul Fire & Marine Ins. Co.*, 196 P.3d at 668.  Accordingly, the court grants Minnesota Life's motion for summary judgment on this aspect of Mr. Bancroft's bad faith claim and likewise denies Mr. Bancroft's motion on the same issue.

The only other aspect of Mr. Bancroft's bad faith claim is his assertion that Minnesota Life failed to provide either mediation or binding arbitration to Mr. Bancroft in light of the dispute between Dr. Cowan and Dr. Shapland concerning Mr. Bancroft's life expectancy.  (*See* Plf. 2d MSJ at 22 ("[I]t was bad faith for Minnesota Life to take

away Bancroft's rights under the [alternative dispute resolution] [p]rovision."); Kelley Decl. ¶ 2, Ex. J at 9-10.)  As discussed above, however, Minnesota Life did not "take away" Mr. Bancroft's alternative dispute resolution rights.  (*See id.*); *see supra* § III.C. Rather, Mr. Bancroft failed to invoke those rights.  *See supra* § III.C.  Minnesota Life did not act in bad faith by failing to provide a type of coverage under the ABPR that Mr. Bancroft never claimed.  Accordingly, the court grants Minnesota Life's motion for summary judgment on this aspect of Mr. Bancroft's bad faith claim and denies Mr. Bancroft's motion.  No portion of Mr. Bancroft's bad faith claim remains for trial.

**F.    CPA**

Finally, Mr. Bancroft asserts that he is entitled to summary judgment on his CPA claim.  (Plf. 2d MSJ at 15-20.)  The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  Minnesota Life opposes Mr. Bancroft's motion and seeks summary judgment in its favor.  (Def. MSJ at 16-18.)

To establish a claim under the CPA, Mr. Bancroft must prove (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to his business or property; and (5) causation.  *See Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co.*, 206 P.3d 1255, 1262 (Wash. Ct. App. 2009).  Where a claim under the CPA is predicated on the denial of an insurance claim, the insured has a heavy burden to prove that the insurer's conduct was "unreasonable, frivolous, or unfounded." *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 329 (Wash. 2002).

//

The court has already determined that Minnesota Life did not breach the ABPR when it denied payment of benefits in June 2017, based on Dr. Shapland's opinion that Mr. Bancroft's life expectancy was greater than 24 months at that time. *See supra* § III.C.1. Indeed, Mr. Bancroft's doctor, Dr. Cowan, conceded in his deposition that basing a life expectancy prognosis on Mr. Bancroft's MIPI score, as Dr. Shapland did, was reasonable. (*See* Cowan Dep. at 61:19-62:2; 62:24-63:8.) The court has also determined that Minnesota Life did not breach the alternative dispute resolution clause of the ABPR because Mr. Bancroft never invoked this provision and thus Minnesota Life never had any obligation to perform under this clause. *See supra* § III.C.2. Thus, the court denies Mr. Bancroft's motion and enters summary judgment in Minnesota Life's favor with respect to any CPA claim arising out Minnesota Life's determination to deny the payment of accelerated life insurance benefits to Mr. Bancroft in June 2017, or any alleged breach of the ABPR's alternative dispute resolution clause.

Nevertheless, Mr. Bancroft also asserts that Minnesota Life violated various WAC regulations during its handling of his claim, and Mr. Bancroft argues that he is entitled to summary judgment on his CPA claim arising out of these WAC violations. (Plf. 2d MSJ at 16-20.) CPA claims "alleging unfair insurance claims practices meet the public interest element because RCW 48.01.030 declares that the 'business of insurance is one affected by the public interest.'" *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000). Further, a single violation of any WAC provision promulgated under RCW 48.30.010 is "deemed to constitute unfair claims settlement practices." *Id.* at 1034 (citing WAC 284-30-300 through WAC 284-30-410 and *Indus.*

*Indem. Co. of the Nw. v. Kallevig*, 792 P.2d 520, 530 (Wash. 1990)). In addition, a single violation of WAC 284-23-600 through WAC 284-23-730, known as Washington's regulations of accelerated life insurance benefits, "will be deemed to constitute an unfair claims settlement practice." WAC 284-23-610(1). Minnesota Life opposes Mr. Bancroft's motion and also seeks summary judgment in its favor regarding any CPA claim based on a violation of a WAC regulation. (Def. SMJ at 16-18.) The court considers each regulation in turn.

       1. <u>WAC 284-23-680</u>

       WAC 284-23-680 provides in pertinent part that "[a]n insurer may not apply conditions on the payment of the accelerated benefits except those specified in the insured's policy or rider." WAC 284-23-680. Mr. Bancroft argues that Minnesota Life violated this provision by utilizing a "90% certainty" standard when it determined that Mr. Bancroft's life expectancy is 24 months or less because this standard is not stated in the ABPR. (*See* Plf. 2d MSJ at 17; *see also* 4/19/18 Crowe Decl. ¶ 3, Ex. 22 (attaching claim journal entries from Minnesota Life for Mr. Bancroft's claim).) Instead, Mr. Bancroft asserts that she should have applied a "more likely than not" standard. (*See* Plf. 2d MSJ at 14.)

       Even assuming that Minnesota Life's application of a "90% certainty" standard violated WAC 284-23-680, Mr. Bancroft's CPA claim based on this WAC provision nevertheless fails. As noted in the court's analysis of Mr. Bancroft's breach of contract claim, Dr. Shapland testified that her June 2017 opinion regarding Mr. Bancroft's life expectancy would have remained the same irrespective of whether she applied the "90%

certainty" standard or a "more likely than not" standard. *See supra* § III.C.1; (*see also* 5/7/18 Shapland Decl. ¶ 10.)  There is no medical testimony to the contrary in the record. Thus, Mr. Bancroft cannot prove the final element of his CPA claim based on this WAC provision—that Minnesota Life's violation of WAC 284-23-680 caused him any damage. *See Ledcor Indus. (USA), Inc.*, 206 P.3d at 1262.

Further, as discussed above, the language of the ABPR required Mr. Bancroft to provide "evidence that satisfies [Minnesota Life]." (11/06/17 Marisseau Decl. ¶ 4, Ex. A at ML 0037.)  Even assuming that Minnesota Life applied a "90% certainty" standard in determining an insured's life expectancy, this standard was not in violation of WAC 284-23-680 because this condition was encompassed by the express language of the ABPR. Accordingly, the court denies Mr. Bancroft's motion for summary judgment and enters summary judgment on this claim in Minnesota Life's favor.

2.  WAC 284-23-730

WAC 284-23-730 states in pertinent part:

> In the event the insured's health care provider and a health care provider appointed by the insurer disagree on whether a qualifying event has occurred, the opinion of the health care provider appointed by the insurer is not binding on the claimant.  The parties shall attempt to resolve the matter promptly and amicably.  The policy or rider providing the accelerated benefit shall provide that in case the disagreement is not so resolved, the claimant has the right to mediation or binding arbitration conducted by a disinterested third party who has no ongoing relationship with either party.

WAC 284-23-730.  Similar to the court's analysis of Mr. Bancroft's breach of contract claim concerning the ABPR's alternative dispute resolution clause, the court also concludes that, under this WAC provision, the difference of opinion between Dr. Cowan

and Dr. Shapland concerning Mr. Bancroft's life expectancy required the parties to "attempt to resolve the matter promptly and amicably," and—failing any amicable resolution—gave Mr. Bancroft "the right to mediation or binding arbitration." *See id.*; *see supra* § III.C.2.

Minnesota Life argues that its June 8, 2017, letter to Mr. Bancroft "undisputedly offered to amicably engage with [Mr. Bancroft] regarding its June 8 claim decision." (Def. MSJ at 17.) Minnesota Life also argues that Mr. Bancroft's decision to immediately initiate litigation reveals his own violation of the WAC regulation. (*Id.*) As detailed above, Minnesota Life stressed in its June 8, 2017, letter that it was "unable to determine, at this time," if Mr. Bancroft's life expectancy met the ABPR's requirements. (4/19/18 Crowe Decl. ¶ 3, Ex. 24.) The letter also "assured" Mr. Bancroft that it was "not a permanent denial." (*Id.*) It encouraged Mr. Bancroft to submit new information for its review and stated that it would "gladly reassess" his claim for accelerated life insurance benefits. (*Id.*) Finally, the letter also encouraged Mr. Bancroft to contact Minnesota Life's claims examiner with any questions and provided her direct extension. (*Id.*) There is no dispute that in response to this letter, Mr. Bancroft did not attempt to contact Minnesota Life but rather, hired counsel and sent his mandatory IFCA pre-suit notice dated June 22, 2017, to Minnesota Life and Washington State's Office of the Insurance Commissioner. (*See* 10/25/17 Bancroft Decl. ¶ 16, Ex. E; *Freeman v. State Farm Mut. Auto. Ins. Co.*, No. C11-761RAJ, 2012 WL 2891167, at *4 (W.D. Wash. July 16, 2012) ("The court holds that IFCA's pre-suit notice provision is mandatory, and that failure to

//

satisfy it mandates dismissal of an IFCA claim.").  Mr. Bancroft then filed suit on August

2, 2017.  (*See* Compl.)

The WAC provision at issue requires that "[t]he parties shall attempt to resolve the

matter promptly and amicably."  WAC 284-23-730.  The provision is a mutual obligation

placed on both the insurer and the insured.  Based on the undisputed facts stated above,

there is no evidence from which a jury could find that Minnesota Life violated its duty to

attempt to resolve the matter promptly and amicably.  Minnesota Life's June 8, 2017,

letter emphasized that its determination was not "permanent" and encouraged further

contact and discussion with Mr. Bancroft.  (*See* 4/19/18 Crowe Decl. ¶ 3, Ex. 24.)  If

anything, the undisputed facts indicate that it was Mr. Bancroft who failed to comply

with his obligations under this WAC provision and who rushed to suit.  Further, as

discussed above, although the WAC provides that in the case "the disagreement is not

[promptly and amicably] resolved, the claimant has the right to mediation or binding

arbitration," WAC 284-23-730, Mr. Bancroft never invoked this right, *see supra*

§ III.C.2.  Accordingly, the court denies Mr. Bancroft's motion for summary judgment on

this issue and grants summary judgment to Minnesota Life instead.

3.  WAC 284-30-330(1)

WAC 284-30-330(1) provides that "[m]isrepresenting pertinent facts or insurance

policy provisions" is "defined as [an] unfair method[] of competition and [an] unfair or

deceptive act[] or practice[] . . . specifically applicable to the settlement of claims."

WAC 284-30-330(1).  Mr. Bancroft contends that Minnesota Life "'misrepresent[ed]

pertinent facts' and misrepresent[ed] 'policy provisions'" by stating in its June 8, 2017,

letter to Mr. Bancroft that "the medical information does not support a life expectancy of 24 months or less." (Plf. 2d MSJ at 18 (quoting WAC 284-30-330(1)).) Without citation to the record, Mr. Bancroft argues that "this is not true" and that "[t]here is medical information which fully supports such a life expectancy prognosis." (*Id.*)

Mr. Bancroft's lack of citation to the record is sufficient in itself to deny his motion for summary judgment.[17] Indeed, he cites to no medical expert testimony at all in support of his argument concerning Minnesota Life's statement. Nevertheless, Mr. Bancroft's argument appears to be based on Mr. Kelley's expert opinion that "Minnesota Life misrepresented a critical fact as the basis for denying [Mr.] Bancroft's claim." (*See* Kelley Decl. ¶ 2, Ex. J at 11.) As discussed above, Mr. Kelley's expert opinion is not admissible. *See supra* § III.A. Thus, there is no admissible expert testimony to underpin Mr. Bancroft's argument concerning the medical information at issue here.

To the contrary, all of the medical testimony in this case supports the reasonableness of Dr. Shapland's analysis. (Cowan Dep. at 13:3-12, 15:1-16:1, 61:19-63:8; Grinblatt Decl. ¶¶ 6, 10.) Accordingly, no reasonable juror could conclude that Minnesota Life violated WAC 284-30-330(1) based on the statement at issue. The court, therefore, denies Mr. Bancroft's motion and grants summary judgment to Minnesota Life on this issue.

//

---

[17] "Judges are not like pigs, hunting for truffles buried in briefs." *Christian Legal Soc. Chapter of Univ. of California v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) (internal quotation marks omitted) (quoting *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) and *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (per curiam)) (alteration omitted)).

Mr. Bancroft also argues that Minnesota Life violated WAC 284-30-330(1) because its June 8, 2017, letter stated that "we are unable to determine, at this time, if your life expectancy will be less than 24 months, which the policy requires." (*See* Plf. 2d MSJ at 18-19; *see also* 10/25/17 Bancroft Decl. ¶ 16, Ex. D.) Mr. Bancroft argues that this statement violates WAC 284-30-330(1) because the ABPR defines a "terminal condition" as "a condition . . . which directly results in a life expectancy of twenty-four months **or less**." (11/06/17 Marisseau Decl. ¶ 4, Ex. A at ML 0037 (bolding added).) Minnesota Life admits that this incorrect statement of the policy language appeared in its June 8, 2017, letter. (Def. MSJ at 18.) However, Mr. Bancroft ignores the fact that the letter begins with a statement of the correct policy language and then restates the correct policy language two more times. (*See* 10/25/17 Bancroft Decl. ¶ 16, Ex. D.) No reasonable juror could conclude that Minnesota Life had breached WAC 284-30-330(1) by "[m]isrepresenting . . . insurance policy provisions" on the basis of the single error Mr. Bancroft cites when that error is read against the letter as a whole, which states the correct policy language three times. Moreover, Mr. Bancroft provides no evidence that he was ever misled by this one incorrect statement of policy language. Thus, he fails to prove the causation element of his CPA claim. *See Ledcor Indus. (USA), Inc.*, 206 P.3d at 1262. Accordingly, the court denies Mr. Bancroft's motion for summary judgment on this issue and enters summary judgment in favor of Minnesota Life on the same issue.

4. WAC 284-30-330(4)

WAC 284-30-330(4) provides that "[r]efusing to pay claims without conducting a reasonable investigation" is "defined as [an] unfair method[] of competition and [an]

unfair or deceptive act[] or practice[] . . . specifically applicable to the settlement of claims." WAC 284-30-330(4). Mr. Bancroft argues that Minnesota Life violated this WAC provision based on his criticism of Dr. Shapland's analysis of Dr. Cowan's opinion, Dr. Shapland's review of the medical literature, and her conclusion that his life expectancy was greater than 24 months in June 2017. (Plf. 2d MSJ at 19.) For all the same reasons that the court denied Mr. Bancroft's claim for bad faith claim investigation, the court also denies Mr. Bancroft's CPA claim under WAC 284-30-330(4) and enters summary judgment in Minnesota Life's favor. *See supra* § III.E.

5. WAC 284-30-380(1)

Finally, Mr. Bancroft brings a CPA claim based on Minnesota Life's alleged violation of WAC 284-30-380(1). (Plf. 2d MSJ at 19-20.) WAC 284-30-380(1) provides that "[t]he insurer must not deny a claim on the grounds of a specific policy provision, condition, or exclusion unless reference to the specific provision, condition, or exclusion is included in the denial." WAC 284-30-380(1). Mr. Bancroft argues that Minnesota Life violates this provision because it applied a "90% certainty" in assessing an insured's life expectancy but does not mention this standard in the ABPR or in its June 8, 2017, letter. (Plf. 2d MSJ at 19-20.) For the same reasons that the court denied Mr. Bancroft's motion for summary judgment on his CPA claim based on WAC 284-23-680, the court does so here as well. *See supra* § III.F.1, § III.B.1. Mr. Bancroft cannot establish the causation element of his CPA claim because Dr. Shapland testified that her June 2017, opinion concerning Mr. Bancroft's life expectancy would have been the same whether she applied the "90% certainty" standard or the "more likely than not" standard Mr.

Bancroft advocates. (*See* 5/7/18 Shapland Decl. ¶ 10.) Accordingly, the court concludes that he cannot prove the causation element of his CPA claim. For this reason, the court denies Mr. Bancroft's motion and enters summary judgment in Minnesota Life's favor instead.

In sum, the court denies Mr. Bancroft's motion for summary judgment on all aspects of his CPA claim and enters summary judgment in favor of Minnesota Life on those same claims.

**G.      Covenant of Good Faith and Fair Dealing, Negligence, and Declaratory Relief**

Mr. Bancroft asks the court for summary judgment concerning liability on all of his claims. (Plf. 2d MSJ at 28.) Mr. Bancroft, however, provides no argument on his claims for breach of the covenant of good faith and fair dealing, negligence, and declaratory relief. (*See generally id.*; *see also* Compl. ¶¶ 49-54, 68-71.) Minnesota Life asserts that it is entitled to summary judgment on these claims for "the same reasons [Mr. Bancroft's] IFCA, CPA[,] and bad faith claims fail." (Def. MSJ at 24.) Mr. Bancroft provides no response to this argument. (*See generally* Plf. Reply; Plf. Resp.) Having reviewed these additional claims and the court's grounds for granting Minnesota Life summary judgment on Mr. Bancroft's IFCA, CPA, and bad faith claims, the court agrees with Minnesota Life and grants summary judgment in its favor on Mr. Bancroft's

//

//

//

//

1 remaining claims.

2 **IV.   CONCLUSION**

3    Based on the foregoing analysis, the court DENIES Mr. Bancroft's motion for

4 partial summary judgment (Dkt. # 29) and GRANTS summary judgment on Minnesota

5 Life's cross motion with respect to all of Mr. Bancroft's claims (Dkt. # 35).

6    Dated this 18th day of July, 2018.

7

8

9 JAMES L. ROBART
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22