1               UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

                             )

4  COLIN BANCROFT,              ) C17-01312-JLR

                             )

5            Plaintiff,   ) SEATTLE, WASHINGTON

                             )

6  v.                       ) July 12, 2018

                             )

7  MINNESOTA LIFE INSURANCE CO.,  ) Motion Hearing

                             )

8            Defendant.   )

                             )

9                             )

10  _____

11          VERBATIM REPORT OF PROCEEDINGS

        BEFORE THE HONORABLE JAMES L. ROBART

12          UNITED STATES DISTRICT JUDGE

  _____

13

14  APPEARANCES:

15  For the Plaintiff:    David E. Crowe

                        Van Kampen & Crowe

16                   1001 Fourth Avenue

                        Suite 4050

17                   Seattle, WA  98154

18

19  For the Defendant:    Medora A. Marisseau

                        Karr Tuttle Campbell

20                   701 Fifth Avenue

                        Suite 3300

21                   Seattle, WA  98104

22

23

24

25

1           THE COURT:  Please be seated.

2       The clerk will call this matter.

3           THE CLERK:  Case C17-1312, Colin Bancroft v. Minnesota

4    Life Insurance Company.

5       Counsel, please make your appearances for the record.

6           MR. CROWE:  My name is David Crowe.  I'm from the law

7    firm of Van Kampen & Crowe on behalf of plaintiff, Colin

8    Bancroft.

9           THE COURT:  Mr. Crowe.

10          MS. MARRISEAU:  Good afternoon, Your Honor.  Medora

11   Marisseau on behalf of the defendant, from Karr Tuttle Campbell.

12          THE COURT:  Thank you.

13      I think the last matter that I had was a status conference

14   involving the Seattle Police Department in which all the pews

15   were filled.  You guys didn't attract quite the same audience

16   today.

17      I'm going to ask you to go to the podium when it's your turn

18   because we need to get a clear record of this.

19      Let me tell you that, as is the case many times when your

20   motion has been pending for a bit, we've had ample opportunity to

21   review the motion and the record, and, therefore, it's my

22   practice that as opposed to having you repeat what you already

23   have given me and which I have had an opportunity to review, it

24   makes better sense to use your time by answering my questions.

25          So I'm going to start with Mr. Crowe, and I have seven or

1    eight questions that I would like you to answer.  If you would go

2    to the podium, sir.

3              MR. CROWE:  Sure.

4              THE COURT:  And if you need to get stuff off your table

5    to answer something, that's fine.

6              MR. CROWE:  Are we going to be discussing the testimony

7    of Dr. Don -- Mr. Don Kelley?

8              THE COURT:  I don't think he's a doctor.  Yes.

9              MR. CROWE:  Yeah.  Right, right, right.  Freudian slip.

10   I'm sorry.

11      Well, I've got a --

12             THE COURT:  Yeah.  You're fine.

13             MR. CROWE:  Do I approach the bench and give you the

14   document?

15             THE COURT:  I've got all of them.

16             MR. CROWE:  Well, no, it's a -- I will explain in a

17   second.  Here you go.

18             THE COURT:  This is the same document that I printed.

19   There are additional pages to it?

20             MR. CROWE:  No, Your Honor.  There's gray highlighting

21   to it.

22             THE COURT:  Yes.

23             MR. CROWE:  Which I'm -- you know, I had agreed with my

24   co-counsel there are some things that should be eliminated from

25   the record and agree are inadmissible.  So with, you know,

1   further analysis, I have highlighted that in gray so it's easy to

2   resolve those issues more quickly and hopefully expedite the

3   process.

4          THE COURT:  All right.

5          MR. CROWE:  But there's no new text or anything like

6   that.  Just highlights.

7          THE COURT:  Well, we were going to talk about that one

8   first.

9          MR. CROWE:  Okay.  Great.

10         THE COURT:  As best I can tell, from looking at what's

11  marked as Exhibit A to Exhibit J, which is found in the docket at

12  48-1, Mr. Kelley is a lawyer.  He lists his education as

13  Southwestern University Law School, JD, he doesn't tell us what

14  he majored in as an undergraduate at USC, and he has an

15  employment history from 1961 through, basically, 2013 working for

16  various insurance companies.

17     So my first question to you was, if that's the case, would

18  you confirm for me that he does not have any medical

19  qualifications?

20         MR. CROWE:  I agree he has no medical qualifications,

21  Your Honor.  And if you look at the document I just provided to

22  you -- maybe it would be best if I just start explaining what my

23  thought process is on that document.

24         THE COURT:  Well, no.  Just, you know, know that's what

25  I'm interested in, in regards to Mr. Kelley.

1     And this particular question is, he offers opinions regarding

2     the medical opinions of Dr. Cowan and Dr. Shapland, and he offers

3     his opinion on the adequacy of the medical literature or accuracy

4     of it, and I don't think that he can do that.  And so if you want

5     to defend that, but it doesn't sound like you're going to.

6          MR. CROWE:  Correct and correct.

7     If you look at the highlighted areas, Your Honor, having read

8     the objections made by Ms. Marisseau to Mr. Kelley's testimony

9     and having further reviewed the record, plaintiff agrees that a

10    number of Mr. Kelley's opinions need not be -- need not be

11    examined by the trier of fact and should be deemed inadmissible

12    for the purposes of the pending motion and will be brought before

13    the jury at trial.  The shaded portions of this report are the

14    plaintiff's -- the portions that plaintiff agree are

15    inadmissible.

16         THE COURT:  Thank you.  That answers that question.

17         MR. CROWE:  First, plaintiff agrees --

18         THE COURT:  Well, you don't need to go any further.  I

19    can read that on my own time.

20         MR. CROWE:  Okay.

21         THE COURT:  Then let's turn to my second question in

22    regards to Mr. Kelley.  Ninth Circuit authority says that a

23    lawyer -- in fact, any expert -- may not provide testimony of how

24    to interpret an insurance policy or provide an explanation of the

25    legal meaning of an insurance policy as written.  And there's a

1    citation to that in the *McHugh* case.

2        It seems to me that large portions of Mr. Kelley's testimony

3    is him saying, "This is what the policy means."  Sometimes he

4    says this is "custom and practice in the industry," and I can

5    recognize that testimony.  But when he says, "This is what the

6    policy means," how do I square that with the teaching that he

7    can't do that?

8            MR. CROWE:  There, again, Your Honor, if you notice the

9    shaded portions, I think you will see that most of the time he

10   was pontificating about the policy language -- which I'm hoping

11   to do in a little bit, and you will be the ultimate judge of --

12   I've eliminated that from his testimony as well.

13       There's actually been significant eliminations of his

14   testimony on the two concerns you have raised.

15           THE COURT:  Is he going to give your money back?

16           MR. CROWE:  I don't know if that's his policy and

17   practice.  I highly doubt it.

18           THE COURT:  That was an aside.  I didn't mean that

19   seriously.

20           MR. CROWE:  If you want to order that.  I don't mean

21   that seriously either, but ...

22           THE COURT:  So let me turn then to the third question,

23   Dr. Cowan is your client's doctor?

24           MR. CROWE:  That's correct.

25           THE COURT:  He says in his deposition, which is in the

1  record, concerning the reasonableness of relying on

2  Mr. Bancroft's MIPI score -- and we will put this once in the

3  record and then go back to calling it "MIPI" -- that's Mantel

4  Cell Lymphoma International Prognostic --

5          MR. CROWE:  -- Index, yeah.

6          THE COURT:  So now that we have got that in the record

7  and I can tell the court reporter where it's at when we need it,

8  he says that, in relying on the MIPI score, it's acceptable, and

9  then we have Dr. Shapland basing her life expectancy calculations

10  on Mr. Bancroft's MIPI score.

11      If Minnesota Life's conduct isn't unreasonable by kind of the

12  concession of your own doctor, how am I supposed to find it's

13  unreasonable for purposes of this case?

14          MR. CROWE:  Well, Your Honor, the assessment Minnesota

15  Life did in June of 2018 does not consider all the facts that

16  they know to date.  And, also, the prognosis Dr. Cowan provided

17  is consistent with the MIPI.  It also has a couple of other

18  factors he assessed that are other independent medical variations

19  that would cause a lower prognosis, namely the deletion of the

20  P53 chromosome as well as the leukocytosis, which is a certain

21  amount of the white blood cells being elevated, which he also

22  stated in his prognosis to the insurance company at that time in

23  their statement.

24          THE COURT:  But if relying on the MIPI is, by your

25  doctor, reasonable, I'm having trouble how you can now say, well,

1  relying on the MIPI was unreasonable.

2          MR. CROWE:  Well, it's a prognostic factor.  What I'm

3  saying is unreasonable is disregarding the opinion of Dr. Cowan,

4  who had a prognosis that was stated, and applying a confidence

5  factor of 90 percent, which states that I'm 90 percent certain

6  somebody is going to die.  That is not what, you know, generally

7  a life expectancy is.  It's usually what's your best estimate of

8  what the life expectancy is for this particular individual.  And

9  Dr. Cowan had the analysis of this particular individual, and he

10  knew the information and he made a prognosis, whereas

11  Dr. Shapland really did not make a prognosis, which she admits to

12  within her deposition testimony.

13      What she did was apply a confidence factor.  She applied, "Am

14  I 90 percent sure that this person is going to die within the

15  time frame?"  Now, that's different than a life expectancy.  A

16  life expectancy is a best estimate.

17      So what you have -- and this is somewhat interesting with one

18  of the articles that Minnesota Life cites to -- is you have got

19  competing standards; one that the insurer asks the doctor to

20  provide, and then a standard that's a heightened standard, that

21  Dr. Shapland applies, whether the insured should have the benefit

22  or not.

23          THE COURT:  Well, what medical record evidence do I have

24  before me that discounts Dr. Shapland's opinion, you know,

25  particularly when you have your doctor in his deposition

1  admitting that the MIPI prognosis of either 29 months or 37

2  months is reasonable?

3       MR. CROWE:  He said it could be reasonable, you know,

4  depending on the circumstances and the individual, and he gave

5  his best prognosis.

6       THE COURT:  Cite me to the medical testimony that's

7  properly before me which relates to that question and impeaches

8  Dr. Shapland's estimate?

9       MR. CROWE:  You know, all of the doctors admit that

10  reasonable doctors come up with different reasonable positions.

11     Now, the question is not whether she has a reasonable

12  prognosis.  The question is whether the claim was unreasonably

13  denied.  And in this situation Minnesota Life was presented a

14  reasonable prognosis.

15     And it didn't even tell the insured that it had another

16  doctor examine his claim.  The denial letter says nothing of

17  Dr. Shapland's evaluation, nor did Minnesota Life follow the

18  proper processes that Washington law requires when administering

19  this kind of claim.

20     Under Washington law, WAC 284-23-780, the insured cannot

21  simply -- the insurer cannot simply rely upon his doctor's

22  opinion and deny the claim.  It has to actually try to resolve

23  the conflicting opinions to try to work the resolution out.

24  Otherwise -- I mean, life expectancy is a hard thing to estimate.

25  We don't know.  It's an uncertainty.  At best it's a forecast.

1    But an insurance company cannot be allowed to just disregard one

2    forecast because they recognize they could have another

3    reasonable forecast as well for the same person.  And in this

4    instance they didn't even know the person.  They didn't examine

5    him as they contemplate they would in their policy.

6         THE COURT:  Counsel, you're pushing a rock up the hill

7    on that one.

8        Let me turn to my greatest area of concern in this.  I don't

9    agree with the reading that Minnesota Life used in regards to the

10   provision "terminal condition."  I don't think that they're tying

11   this, "We reserve the right to ask for an independent medical

12   opinion," that that is tied to the next sentence, which is "in

13   the case of a difference of opinion."

14       It seems to me that the difference of opinion -- in this

15   entire policy it talks about, "is the condition caused by a

16   sickness or accident which directly results in a life expectancy

17   of 24 months or less," and it then talks about what everyone must

18   do.  Your client needs to say, "File the claim for accelerated

19   benefits," and it requires a certification by a physician, which

20   is done.  Then it says, "Minnesota Life reserves the right to ask

21   for an independent medical verification of a terminal condition."

22   I'm going to assume that independent medical verification means

23   something that really isn't present in this case, because they

24   use their own internal folks.

25        MR. CROWE:  It's defined right below too, Your Honor.

1          THE COURT:  All right.

2      But then it says, "In the case of a difference of opinion,

3  the insured has the right to mediation or binding arbitration

4  conducted by a disinterested third party who has no ongoing

5  relationship with either party."  That's a right given to your

6  insured.

7      So Mr. Bancroft, after he gets this denial letter, has a

8  difference of opinion -- he says 24 months or less; they say 24

9  months plus one day or more -- he then holds the right to request

10  mediation or binding arbitration conducted by a disinterested

11  third party.  There's nothing in the record to suggest that he

12  did that.  Instead, he appears to have consulted lawyers -- it

13  may or may not have been you at the time -- and you then send an

14  IFCA letter and start the litigation process.

15          MR. CROWE:  Well, two things, Your Honor.  If you read

16  the section -- the contract, as well as reading the WAC, the WAC,

17  284-23-730, requires that the insured -- the insurer try to

18  amicably resolve the dispute with his insured prior to issuing a

19  binding decision, i.e., a denial.

20      So rather than issuing a denial letter, the insured in

21  this -- the insurer in this instance should have and could have

22  contacted Mr. Bancroft and said, "We have a disagreement about

23  your opinion.  Let's try to work this out.  If we can't work this

24  out, you have the right to mediation or binding arbitration."

25  That's what the WAC provision provides.  That's not inconsistent

1    and actually aligns with the policy provision.  In fact, I'm all

2    but certain that the Insurance Commissioner demanded this be in

3    the policy when it was conferring with -- interpreting the WAC as

4    well.

5         The point is, the arbitration/binding mediation is supposed

6    to happen prior to any claim decision being final and the insured

7    being denied.  And he should be notified of his rights on this

8    fact too, which Minnesota Life represented to the policyholder it

9    would do, but there's no inference -- they don't even recognize

10   he had the right to binding mediation or -- mediation or

11   arbitration.  They admit they don't believe he had that right

12   because they didn't commit --

13        THE COURT:  I've already wiped that out because they're

14   just wrong on that, in my view.

15        MR. CROWE:  Well, if you --

16        THE COURT:  Let me read you what it says here, because I

17   don't think you are reading it correctly.  "In the event the

18   insured's healthcare provider and a healthcare provider appointed

19   by the insurer disagree on whether a qualifying event has

20   occurred, the opinion of the healthcare provider appointed by the

21   insurer is not binding on the claimant."  They don't in this

22   instance say it's binding on the claimant.  They just say, you

23   know, we have a disagreement; we don't think that, you know, you

24   have triggered the policy yet.  "The parties shall attempt to

25   resolve the matter promptly and amicably."  That's different than

1    what you're saying.

2          MR. CROWE:  Well, Your Honor, they did make it binding.

3    They did bind it on the claimant.  They denied his claim.  They

4    said, "We're not going to pay it.  Based on our doctor's opinion,

5    your claim is not going to be paid."  That's a final decision.

6       What they could have done was say, "We have got a

7    disagreement with your doctor's opinion, we think you are going

8    to live longer than 24 months," and that's --

9          THE COURT:  Go ahead.

10          MR. CROWE:  That's what -- let me get the WAC in front

11   of me too.

12          THE COURT:  I mean, I don't think you're correct in this

13   when you say that's a final -- "Your Honor, they did make it

14   binding.  They did bind the claimant.  They denied his claim."

15      Well, they didn't deny his claim.  What they said is, "This

16   not a denial of the claim.  We don't think you're eligible at

17   this time," and then set forth how to contact them in the future,

18   provide additional information.  It seems to me that that's

19   different than saying, "We deny your claim."

20          MR. CROWE:  Your Honor, the record is filled with

21   admissions that that was a denial letter.  Minnesota Life's

22   30(b)(6) corporate designee admitted this is how they deny a

23   claim.  This is their form denial letter.  Ms. Sarah Taylor, the

24   author of the letter, admitted, this is a denial letter, this is

25   our form denial letter, this means we are denying the claim.

1   In fact, if you look through the claims notes, what it's

2 entitled is "denial letter."  Now, this "provisional" denial

3 letter and "temporary" denial letter is argument made by lawyers

4 later, but that is not what the insurer did at the time.  It

5 denied the claim.  It has some positive language, like almost

6 every denial letter you see will.  I mean, "Contact us if you

7 have questions," things like that, but that should be considered

8 mere puffery.  What was really happening here is, they don't pay

9 the claim.  They said no.  They didn't say, "We will work with

10 you."  They said no.

11   And to Mr. Bancroft at that point, the claim was denied, and

12 he would not be paid.  I don't know how you can consider their

13 denial letter anything less than what the company considers it.

14   THE COURT:  Where, sir, does it cite -- you know, I

15 don't think I made up this stuff about, you know, "send us

16 additional information."

17   MR. CROWE:  It says send us "new information" if you

18 have it.  It represents, "If you have new information to provide

19 us, please do so," saying that your claim has been denied with

20 the information that we have, with the prognosis that you were

21 given; we are denying your claim.

22   Now, you can always reapply for a claim if you're insured,

23 and he was still insured at that point.  So saying that you can

24 send us new additional information and we can reconsider your

25 claim is basically saying reapply.  You can reapply for the

1  benefit if you want to at a later time.  But that's initiating a

2  new claim.  They denied this claim.

3      THE COURT:  Well, did your client, in the face of him

4  saying, "I'm covered, pay me my money," and the insurance company

5  saying, "You haven't triggered the policy provision yet," however

6  you want to characterize that, did your client ask for mediation

7  or binding arbitration conducted by a disinterested third party?

8      MR. CROWE:  He did not ask for mediation or any kind of

9  alternative dispute resolution.  However, he did provide a

10 process where the insurer could have come back and tried to

11 amicably resolve the claim by issuing an IFCA notice rather than

12 going straight to the courthouse.

13     THE COURT:  Whoa.  When did IFCA notices become

14 alternative?

15     MR. CROWE:  They're not alternative, Your Honor.  But

16 they -- within IFCA itself, it provides a 20-day period for the

17 insurer to be notified and to attempt to resolve the claim with

18 the insured.  And Minnesota Life made no attempt, after being

19 notified there was a disagreement with their decision, to come

20 back and contact the insurer -- the insured and try to work

21 things out, this out.

22     THE COURT:  Counsel, that just stands that process on

23 its head.  What you're telling me is that sending them a letter

24 saying "If you don't resolve my claim in 20 days, I'm suing you"

25 meets the definition of mediation or binding arbitration.

1          MR. CROWE:  No, I'm not saying it does.  I'm saying it

2     is an effort to try to resolve the dispute before they initiate

3     suit.  And that's what IFCA is.  The IFCA letter is sent out and

4     it's sent to the insurer for an attempt before going to court so

5     the parties can try to resolve the disagreements they have.  And

6     if they don't, then it's appropriate to go to court.  But that is

7     what the cooling period is for, is to attempt to resolve the

8     dispute with the insured.

9          THE COURT:  Well, do you agree with me that the

10    obligation under the policy language is that it's Mr. Bancroft

11    who has the right to exercise mediation or binding arbitration?

12         MR. CROWE:  Well, in this instance, Your Honor --

13         THE COURT:  I think that can be answered yes or no.

14         MR. CROWE:  He does -- the policy, if you were to

15    interpret it the way you are, it says yes.  The problem is, the

16    insurer is not interpreting it that way.  The insurer is

17    interpreting it like it's saying, well, no, we don't have to give

18    him binding arbitration.  So they don't notify him of any of

19    these rights.

20         THE COURT:  Well, when do they have to notify him?  Give

21    me the Washington State case that says if you've got clear

22    language in a policy, it says right here -- and you've admitted

23    that, yes, that burden is on him -- by the way, as a matter of

24    law in Washington, I, the insurance company, or it, the insurance

25    company, has an independent obligation to then say, and, oh, by

1 the way, under the language in the policy, you have a right to

2 engage in mediation or binding arbitration.  I'm looking for that

3 case, because I can't find it.

4 　　　　MR. CROWE:  There's certainly no case that says that,

5 Your Honor.  This is accelerated benefits.  You are going to find

6 very little authority throughout the country on these cases.

7 　　　　THE COURT:  Well, then let's broaden it out.  Where in

8 the general context of insurance is there a law that says the

9 obligation is on the company to notify the policyholder every

10 time an event happens that, oh, by the way, here are all your

11 rights under the policy?

12 　　　　MR. CROWE:  Well, the WAC in this instance actually says

13 that the parties are supposed to amicably attempt to resolve the

14 dispute.  There wasn't an amicable intent to resolve the dispute.

15 They denied the claim.  They made their decision, what they were

16 going to do with the claim, before they attempted to -- before

17 anything could have happened, before ...

18 　　But if you look at the WAC, the way it's prescribed, is that

19 before that denial letter happens, you should be trying to work

20 it out with the insured.  Because in this instance they're

21 dealing with people who have limited life expectancies, who have

22 just probably gotten terrible news, just been -- you know,

23 they're fighting with numerous other issues.  There is certainly

24 a reason why the Insurance Commissioner has promulgated rules to

25 protect insureds in Washington that are terminally ill.

1           THE COURT:  Okay.  Let me cover one more area.

2           MR. CROWE:  And also, Your Honor, one other problem,

3    Your Honor, I understand that -- I understand your

4    interpretation.  It's a very reasonable interpretation of the

5    contract.

6           THE COURT:  Thank you.

7           MR. CROWE:  And the problem is -- the problem is, the

8    insurance company has another interpretation of the contract.

9    I'm promoting a third interpretation of the contract.  So

10   although you're seeing no ambiguity with your interpretation of

11   the contract, the insurance company is not reading it that way.

12   They're reading it, "We don't have to provide this right unless

13   we do a condition precedent that we're never going to do."

14   Because why would they ever spend the effort to examine an

15   insured individual when they can just deny the claim and say,

16   well, you know, it's a life expectancy, reasonable doctors can

17   differ, and reasonably he might live five years rather than two

18   years, or he might live 18 months or 24 months and a day, and

19   just drag out the process?

20       I mean, at some point it's -- I mean, that's bad faith to be

21   hiding behind the policy language, language in your policy, to

22   avoid what you acknowledge -- well, what you state is a clear

23   interpretation of the policy.  They're avoiding that, and they're

24   avoiding informing their insureds of any of this information or

25   any of their rights, and they admit they're doing so.

1          THE COURT:  You know, sir, your argument would have a

2     lot more strength if they just said no.  But when your own doctor

3     says their judgment, done by a medical professional, is

4     reasonable, that's a tougher road.

5          MR. CROWE:  He says it could be reasonable.

6          THE COURT:  As is his --

7          MR. CROWE:  Yes.

8          THE COURT:  -- could be reasonable, or there is --

9          MR. CROWE:  No.  He believes there's -- the prognosis,

10    he believes, was correct in this instance.  He admits -- he's

11    very candid -- he admits that life expectancies aren't an exact

12    science.  And this is a rare cancer, it's a rare disease, one

13    which he has specialty in, and he made his best prognosis.

14         And what he got in return was somebody stating, well -- well,

15    actually, not even explaining the doctor reviewed it -- just in a

16    denial letter, it states that, you know, that pursuant to medical

17    literature, your claim does not meet the definition of our

18    policy.  But that's not true.  There is medical literature that

19    does support the -- support the claim in the policy.

20         And so what the insurance company is representing to you now,

21    "that the doctor examined it," was not informed to the insured at

22    that point.

23         THE COURT:  All right.  Let me ask you one last

24    question.

25         MR. CROWE:  And also --

1           THE COURT:  It's my turn to talk, sir.

2           MR. CROWE:  Okay.

3           THE COURT:  Ultimately Minnesota Life pays in November?

4           MR. CROWE:  They paid while the summary judgment motion

5    had been filed, it was pending, and --

6           THE COURT:  Answer my question.

7           MR. CROWE:  Right, they paid.  November 2nd was, I

8    believe, the date the check was -- the letter was mailed.

9           THE COURT:  Okay.  And their denial letter was when?

10          MR. CROWE:  June 8th.

11          THE COURT:  And your IFCA letter was when?

12          MR. CROWE:  I believe June 22nd.

13          THE COURT:  Okay.  So from June through November -- they

14   promised me there was no math here -- is that four months?  June,

15   July -- well, it's late June.  So July, August, September,

16   October, four months.

17          MR. CROWE:  Okay.  About that.

18          THE COURT:  So your client is denied this money for four

19   months.

20          MR. CROWE:  Well, closer to five, because it was the

21   beginning of June when he got the denial letter.  Half a week

22   less than five months, yeah.

23          THE COURT:  If there had been --

24          MR. CROWE:  I have been doing math with my seven-year

25   old, so there's been a lot of fingers lately.

1          THE COURT:  So if your client had invoked the right that

2    he had to go to mediation or arbitration, I'm trying to figure

3    out -- I mean, in my experience, most of the time mediation or

4    arbitration takes some period of time to get set up -- I

5    recognize these are dire circumstances -- and then we have the

6    arbitration or the mediation.  And I'm down to what appears to me

7    to be kind of a couple of months of interest on some funds.  Is

8    that how you want me to look at this?

9          MR. CROWE:  No.  Your Honor, if he would have invoked

10   the right to mediation/arbitration, I don't think they would have

11   accepted it because they didn't -- they don't agree that it was

12   even applicable.  If he would have said, "I want to mediate this

13   dispute, I want to arbitrate this dispute," they would have said,

14   "Well, we never gave you an independent medical verification, so

15   you don't have that right."  That's exactly what they admit.

16   They don't believe he had the right.

17        So if he hypothetically would have invoked the right, they

18   could have said, "You don't have that right, there's a condition

19   precedent to that being applicable."

20         THE COURT:  My problem is that they don't let me engage

21   in speculation.  I'm supposed to find the facts.  Where in the

22   record is the fact that they said, "You don't have a right to

23   mediation or arbitration because we think it's only triggered by

24   an independent medical examination"?

25         MR. CROWE:  Oh, that's replete in the 30(b)(6)

1  deposition, Your Honor.  He says it three or four times.  I asked

2  a number of times on that.  We can go -- would you like some

3  citations right now?

4        THE COURT:  If we have the transcript, we should be able

5  to find it.

6        MR. CROWE:  Yeah.  I believe around page 77 is a very

7  clean citation.  I believe around page 137 is a very clean

8  citation.  I believe around page 125 is a very clean citation.

9        But he admits that, in any instance, regardless of who the

10  insured is, if they don't invoke that condition precedent, i.e.,

11  having an independent medical certification being requested and

12  sought, that "difference of opinion," in the second sentence of

13  that paragraph, refers to the first sentence, and Minnesota Life

14  does not agree that arbitration or mediation is appropriate.

15        I asked him for Mr. Bancroft, if he believed -- if the

16  company believed that mediation or arbitration -- he had --

17  Mr. Bancroft had the right to mediation or arbitration, and he

18  said no, he did not, because there was no independent medical

19  verification.  And I believe the one specific to Mr. Bancroft is

20  around page 137 of the transcript.  I can provide exact cites if

21  you would like.

22        THE COURT:  All right.  You are not really answering my

23  question.  My question is, we're in June of 2017.

24        MR. CROWE:  Yes.

25        THE COURT:  And there's been a denial --

1           MR. CROWE:  Yes.

2           THE COURT:  -- your term.

3       Does Mr. Bancroft know at that point that he has no right to

4    mediation or arbitration?

5           MR. CROWE:  That is what the insurance company believed

6    at that time.

7           THE COURT:  I didn't ask you that.  I asked you, does

8    Mr. Bancroft believe that he does not have a right to mediation

9    or arbitration?

10          MR. CROWE:  There's no facts in the record about

11   Mr. Bancroft's knowledge at that point.

12          THE COURT:  Okay.  Thank you, sir.  You can be seated.

13   Ms. Marisseau --

14          MS. MARRISEAU:  Good morning, Your Honor.

15          THE COURT:  -- you heard my discussion with Mr. Crowe.

16          MS. MARRISEAU:  Yes.

17          THE COURT:  I can't find any interpretation basis for

18   linking sentence one and sentence two.  It says "difference of

19   opinion" in that particular language.

20      On what basis did you contend that those two were linked?

21   And Mr. Crowe has done a nice job of saying, you know, that was

22   just their policy carved in stone.

23          MS. MARRISEAU:  Your Honor, for purposes of this motion.

24          THE COURT:  You've got to get --

25          MS. MARRISEAU:  Sorry.  I'm too short.

1      Your Honor, for purposes of this motion, we'll concede

2  they're not linked.

3      And in that context, then we move on to the next issue,

4  right?  And this is all about whether or not Mr. Bancroft should

5  have exercised the right to arbitration/mediation.  And we have

6  two different things.  We have the policy which talks about

7  mediation and arbitration, and then we have also the Washington

8  Administrative Code that talks about parties needing to amicably

9  resolve their disputes.  So I think it's the same thing.

10      And we have what's been called the "denial letter."  It's in

11  the record at 8-1, page 34.  And it says exactly as Your Honor

12  indicated.  "At this time, we are unable to consider this

13  benefit," and they give an explanation.  And they say, "With the

14  information we received from your doctor, we are unable to

15  determine, at this time, if your life expectancy will be less

16  than 24 months" -- 24 months or less, that was a typo, and that

17  was briefed -- "which the policy requires."  Then they go on, and

18  this is really important, "We understand this is a difficult and

19  sensitive issue.  Please be assured this is not a permanent

20  denial of benefits.  At this time, however, the medical

21  information does not support a life expectancy of 24 months or

22  less."  And then, "If you have new information that supports a

23  life expectancy of 24 months or less, please submit it and we

24  will gladly reassess your claim.  If you have questions ... "

25  You know, they gave the direct line.

1    So I think what this is is the evidence that there's a

2    disagreement between the two physicians in terms of life

3    expectancy, and --

4         THE COURT:  Go ahead.  I didn't mean to cut you off.

5         MS. MARRISEAU:  Yeah.

6    So then the next step is, you know, an IFCA notice, you know.

7    And there's no question that counsel was involved early on.  So

8    it wasn't like Mr. Bancroft didn't have the policy.  He testified

9    he had it.  It was right there in the policy that he had that

10   right.

11   And now we're into the realm of speculation, that if he had

12   requested it, what would Minnesota Life have done.  I mean, it's

13   outside the record, so I won't talk about the contacts that were

14   made between counsel before that.  So I don't think that's

15   relevant.  We can't speculate about it.  And I think it would be

16   a mistake to use what Minnesota Life's interpretation of the

17   policy is and to apply that to a hypothetical fact that never

18   happened.

19        THE COURT:  Well, that's what I'm trying to probe.  I

20   mean, in your motion for summary judgment, your motion, at 15,

21   you make the flat-out statement that Minnesota Life had no

22   obligation to engage in alternative dispute resolution with

23   Mr. Bancroft because there is not an independent medical

24   verification requested.

25        MS. MARRISEAU:  That was the company's reading of the

1    policy.  However, I think it's a very different situation if

2    Mr. Bancroft, either through his counsel or individually, said,

3    "Hey, my policy says I have a right.  What are you going to do?"

4    Now we have a whole different set of facts which we were never

5    presented with, and we don't know what would have happened.

6    Would they have now, in litigation, come up with this, you know,

7    articulation of the policy, or would they have been, you know,

8    happy to negotiate with him?  It's hard to say.

9        But I think the real -- the other issue that perhaps your

10   questions were getting to is, what is the materiality of this?

11   We can't speculate that they would have settled.  We can't

12   speculate what an arbitrator would have decided.  And so we have

13   to look at what the record is.  And the record is, as Your Honor

14   pointed out, Dr. Cowan admits that the 37-month MIPI reliance on

15   that prognostic index was reasonable.  So do we expect the

16   arbitrator to have reached a different result?  And what's the

17   timing?  I mean, we are talking about four to five months.  And

18   so are we assuming it's going to happen shorter than that?  These

19   are the kind of things that I think are speculation, and I don't

20   think they're appropriate in terms of the issues that are

21   presented, because plaintiff, for the bad-faith claims, the CPA,

22   the IFCA, the bad faith, he's got a high burden, and it's his

23   burden, and it's unreasonable, frivolous, and unfounded.  And so

24   even if it was a right -- and we can speculate that he would have

25   exercised it and speculate that maybe Minnesota wouldn't have

1 honored it -- where does that leave us in terms of those cases?

2 THE COURT: Well, Mr. Crowe just told me that

3 your examiner, whoever is the claims person for this, said, in

4 every case, at all times, if there's no independent medical

5 verification, then it's denied; that you don't get to go to

6 mediation or arbitration. Does that misstate his testimony?

7 MS. MARRISEAU: I would have to pull out his testimony.

8 I think he was being asked for an interpretation of the policy --

9 and it wasn't the claims person -- an interpretation of the

10 policy as opposed to what's ever happened. And I think there was

11 testimony from the claims person that said, "We don't do medical

12 examinations." So I don't know that they ever were presented

13 with such a situation. So I don't think that is an accurate

14 statement of the testimony.

15 THE COURT: Is it your position that if the alternative

16 dispute resolution clause is triggered because there's a

17 difference of opinion, would Minnesota Life have an obligation to

18 inform Mr. Bancroft in its letter that he has the right to engage

19 in either mediation or arbitration?

20 MS. MARRISEAU: I don't think so. It's clear in the

21 policy, it says you have the right. And so I can't think of any

22 case that says you have to inform insureds of rights that they

23 already know about in the policy. So if there's some argument

24 out there or legal theory, I'm not aware of it.

25 THE COURT: Then you don't practice in California.

1      MS. MARRISEAU:  Well, probably California then.  That

2   might be a different thing.

3      Does Your Honor have any more questions for me?

4         THE COURT:  Yes.

5         MS. MARRISEAU:  Okay.  Sorry.

6         THE COURT:  Well, I want to go back to this question of

7   the WAC, which I keep misplacing.  I mean, Mr. Crowe properly

8   says that the second sentence of WAC 284-23-730 says, "The

9   parties shall attempt to resolve the matter promptly and

10  amicably."  And what you have told me is writing a letter, saying

11  you can send us more information if you want, even as you lay

12  dying on your deathbed, satisfies that obligation.  Is that your

13  position?

14        MS. MARRISEAU:  No.  The position, as the letter says,

15  the June 8th letter says, it's assuring him that this is not a

16  permanent denial of benefits, that it was considered, and that

17  the information and any questions that he had about what the

18  information was that Minnesota Life relied upon could be provided

19  to him.  I mean, it was an opening of a dialogue.  Maybe it

20  wasn't the most artfully created letter, but it gave him

21  everything he needed, to say here is what our position was, here

22  is what your doctor's position was, there is a disagreement,

23  it's not permanent, please call us.  You know, maybe they could

24  have said more.  Sure, we could all do that.  But instead it was

25  met with an IFCA notice.  I mean, I think if -- I don't want to

1  speculate, but if there had been a different response, I think it

2  would have had a different result.

3  　　　　THE COURT:  All right.  Anything else you would like to

4  tell me?  I will get Mr. Crowe back up and give him the last

5  word.

6  　　　　MS. MARRISEAU:  Okay.

7  　　I don't know if Your Honor is still interested in anything

8  about what Mr. Kelley has to say, but I will say --

9  　　　　THE COURT:  Mr. Kelley dug his own grave and then jumped

10  in it.

11  　　　　MS. MARRISEAU:  Okay.  All right.

12  　　　　THE COURT:  So I will read the parts that take out the

13  things and we will see where we are.

14  　　　　MS. MARRISEAU:  Well, I did just want to make a point,

15  and I have my own little handout, which is somewhat truncated now

16  that plaintiff's counsel has made concessions, but that the

17  things that are being excised from his opinion are the bases for

18  his opinion, and so you can't have an opinion, take out the

19  bases, and then still have the opinion.

20  　　The other issue is, I notice that Opinion 4 is not excised,

21  and Opinion 4 is just a straight-out legal conclusion.  You know,

22  "Minnesota Life misrepresented a critical fact."  That's directly

23  out of WAC 284-30-330(1), and that's part of their proof that

24  they have to show under a CPA claim.  And so he's now telling us

25  his legal opinion about that.  So that also needs to come out.

1    And then the other piece, to the extent that Your Honor is

2  in any way persuaded that anything from Mr. Kelley should

3  survive, is that there are a number of bases for his opinions

4  which are just not based on the evidence.  They misstate the

5  facts.  They're not using specialized knowledge.  He says things

6  like, "As a layperson, not particularly trained in medicine, I

7  would think a person taking the cocktail of medications

8  Mr. Bancroft was taking would be expected to improve."  This was

9  not excised, and it's being used to argue that -- excuse me --

10  Dr. Shapland impermissibly relied on the improvement.  But that

11  ignores the fact that doctors look at marked improvement and

12  improvement treatment in a very different light than lawyers and

13  maybe claims adjustors.  Because when someone has a marked

14  improvement in a cancer treatment, that means they didn't die

15  from the cancer treatment, which is a possibility, and they're

16  actually getting much, much better, which, of course, was the

17  case.

18    There's other examples where he gives his own lay opinion.

19  You know, he talks about comparing the declaration of Dr. Cowan

20  with the APS.  That's not an expert opinion.  So there's many

21  examples like that.

22    So I would submit that the entire opinion and report and

23  testimony of Mr. Kelley should be stricken because the bases for

24  his opinions are, admittedly, stricken, and the remaining

25  opinions are either legal conclusions or not helpful to the jury

1   because they're not expert opinions.

2          THE COURT:  All right.  Thank you, counsel.

3          MS. MARRISEAU:  Thank you, Your Honor.

4          THE COURT:  Mr. Crowe, briefly.  You get the last word.

5          MR. CROWE:  Sure.

6          THE COURT:  A practice point.  When you are in federal

7   court, the *Daubert* standards are really well documented.

8   Mr. Kelley is pretty clearly not someone who testifies a lot in

9   federal court.  He's going to get banged every time, turning in

10  something like that.

11         MR. CROWE:  Well, he has testified a lot in federal

12  court, amazingly, Your Honor.  So, I mean, that's not true.  But

13  he has numerous opinions in federal court.  You will see his

14  testimony being used.

15         THE COURT:  Then I suggest he go back to medical school.

16         MR. CROWE:  I suggest I might too.

17      Your Honor, what we're getting into is, could Minnesota Life

18  have reviewed and considered the policy and considered the claim

19  in a reasonable way and come up with a reasonable result, and the

20  answer to that is, I agree, they could have.  They could have

21  come up with a reasonable median, they could have come up with a

22  reasonable prognostication, and they should have.  But what

23  instead they did was they have -- they direct their doctors not

24  to provide what they believe is a reasonable prognosis, but what

25  they need to provide is a 90 percent confidence factor or they

1  deny the claim.

2      So you have an insured's doctor providing one sort of

3  opinion, and that opinion is his prognosis, and then you have --

4  which could be a median, it could be around the median, it could

5  be a deviant for various reasons.  And, you know, Dr. Cowan's

6  opinion, he gave various reasons, which he articulates, from the

7  median, which, you know, by the time they denied it, it had met

8  the MIPI median, since the diagnosis was in January and five

9  months later, in June, that was for 24 months.  But here what you

10  have was the doctor, the in-house doctor, she wasn't trying to

11  make a prognosis, nor did she make a prognosis; what she said

12  was, I'm not 90 percent sure that that person is going to die.

13  And as Minnesota Life's corporate designee explained, that

14  designation, their 90 percent confidence factor, that means 90

15  out of 100 people -- greater than 90 out of 100 people with that

16  condition would die within the time frame.  And that is not a

17  life expectancy.  That is -- that is -- it's outrageous, Your

18  Honor.  That is throwing up a heightened standard on the policy,

19  which is not stated in the policy, and they're trying to do so to

20  "satisfy us."

21      I would also like to look at the other WAC provisions, the

22  WRLAB provision, that, you know, this insurer doesn't even care

23  to understand the laws that accelerated benefits -- for

24  accelerated benefits in the State of Washington.  They flatly

25  admitted they didn't know there was accelerated benefit laws in

1    Washington.  So how could they apply them correctly?

2         But if you look at that statute, it says that there are no

3    conditions that can be applied in these instances that are not

4    specified in the policy.  And Minnesota Life is trying to tell

5    you that "satisfy us," "us" being the reasonable insurer, acting

6    reasonably in the State of Washington, which, as you well know,

7    has to keep the insured's interests on equal footing as its

8    own -- they're not doing that -- they are saying, to their

9    doctors, tell me if 90 out of 100 people would die with this

10   condition.  And their doctors are saying, well, that's a pretty

11   heightened standard; I can confidently opine that not 90 people

12   would die out of this condition.  But that's not providing a life

13   expectancy.

14        So when the difference of opinion -- and they don't explain

15   this in their denial letter, what they actually are doing for the

16   evaluation, and they're certainly not specifying it in their

17   policy, that they provide this condition, and they don't specify

18   in their policy that they require a median or they require some

19   certain MIPI or some biologic MIPI or some -- you know, they

20   could write a policy, an agreed-to standard by the medical

21   community, if you reach the median or not -- you know, if you are

22   in the median or not, we will pay the claim, the median or

23   greater.  But what they are doing is, you need to be in the

24   90th percentile, 90 out of 100 people is how they review and

25   analyze the policy.  That's what Dr. Shapland did in June.  She

1  admits that.  The corporate designee admits that.  Now they're

2  telling you, well, there's medians that support a diagnosis, but

3  that's not what they applied.  They applied their confidence

4  factor, and that is unreasonable.

5       THE COURT:  If I look at this, though -- I may be hung

6  up on this -- but, I mean, your doctor says their conclusion is

7  reasonable.  What more is required?  I mean, I don't care if it's

8  90 percent or it's 100 percent or it's 40 percent.  What I need

9  to have some basis for is believing, is their conduct reasonable.

10      MR. CROWE:  They hypothetically could come up with a

11  reasonable prognosis, but the conduct they did was not that

12  hypothetical.  They did not --

13      THE COURT:  Your doctor said it's reasonable.

14      MR. CROWE:  He doesn't say their 90 percent certainty

15  standard is reasonable.  I have seen nothing that says a

16  90 percent certainty standard for life expectancy is reasonable.

17  That's the standard they apply.

18      THE COURT:  Well, stop, because you keep shifting your

19  target here.  I'm not looking at how they got there.  I'm looking

20  at the final result.  Your doctor says one thing; their doctor

21  says something else.  Your doctor says both of them are

22  reasonable.

23      MR. CROWE:  He said could be reasonable.  He admits that

24  reasonable physicians could differ.

25      THE COURT:  Okay.

1    MR. CROWE:  Yeah.

2    THE COURT:  What do I make out of the testimony in

3  Shapland's deposition, which I think you conducted, that she

4  said, if I use the standard of more likely than not, which would

5  be a 51 percent, my opinion would have been the same?

6    MR. CROWE:  She didn't use that standard, Your Honor.

7    THE COURT:  But she says that she --

8    MR. CROWE:  Insurance laws in Washington aren't

9  hypotheticals that insurance companies can say, well, we could

10  have done it this way, and if we would have done it this way,

11  then we would have kept up with the same -- the same result.

12    First of all, you're dealing with, again, a situation where

13  it's a hypothetical.  Of course she works for the company and of

14  course she is going to back her opinion, but that's not what she

15  did at the time and that's not what she was asked to do at the

16  time.  What she was asked to do at the time was provide -- it was

17  to apply an unstated condition in their policy, and it resulted

18  in denial of the claim.  And that's unreasonable.  They

19  unreasonably denied the claim.

20    Whether they could have ended up with the same result

21  reasonably, yes, possibly they could have.  I mean, I still think

22  that they should have notified the insured, they should have told

23  them of their rights, they shouldn't assume that there's no

24  binding arbitration.  And I found the citation, one of the

25  citations, that is actually on page 71 where it clearly states:

1    Did Mr. Bancroft have a right to binding arbitration?  No, he did

2    not.  We didn't do independent medical verification, so he did

3    not.

4              THE COURT:  All right.

5              MR. CROWE:  And, Your Honor, the record also shows that

6    there's no indication they have ever done a binding arbitration

7    or mediation or anything like that because they don't conduct

8    these independent medical verifications.

9              THE COURT:  Thank you.

10       Counsel, the matter is taken under submission.  We will get

11   you a written opinion.  It's an interesting question.  We will

12   leave it at that.  A written opinion will be forthcoming.

13       Thank you, counsel.

14             MR. CROWE:  Thank you, Your Honor.

15             MS. MARRISEAU:  Thank you, Your Honor.

16                      (Adjourned.)

17

18             C E R T I F I C A T E

19        I, Nickoline M. Drury, RMR, CRR, Court Reporter for

20   the United States District Court in the Western District of

21   Washington at Seattle, do certify that the foregoing is a correct

22   transcript, to the best of my ability, from the record of

23   proceedings in the above-entitled matter.

24                      /s/ Nickoline Drury

25                      Nickoline Drury